[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-15333

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 29, 2007
THOMAS K. KAHN
CLERK

D. C. Docket Nos.
05-00252 CV-J-20 & 03-17148-BKC-3P

In Re:

ARTHUR I. JACOBS

Debtor.

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARTHUR I. JACOBS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 29, 2007)**

Before PRYOR, KRAVITCH and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

Arthur I. Jacobs appeals from the District Court's reversal of an order of the Bankruptcy Court, in which the Bankruptcy Court determined that Mr. Jacobs's federal income tax debt is dischargeable in bankruptcy and that Mr. Jacobs had not willfully attempted to evade or defeat a tax within the meaning of 11 U.S.C. § 523(a)(1)(C).  Mr. Jacobs argues that the District Court improperly substituted its own factual findings for those of the Bankruptcy Court, and that the District Court applied an incorrect legal standard for nondischargeability under § 523(a)(1)(C). We have jurisdiction over Mr. Jacobs's appeal pursuant to 28 U.S.C. § 158(d)(1),[1]

---

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]28 U.S.C. § 158(d)(1) provides:  "The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section."

28 U.S.C. § 158(a) provides in relevant part:

> (a) The district courts of the United States shall have jurisdiction to hear appeals
>
>    (1) from final judgments, orders, and decrees;
>     . . .
> and, with leave of court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.  An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

2

and will affirm the District Court's decision. As explained below, the Bankruptcy Court applied an overly-strict legal standard for willfulness, and the undisputed facts demonstrate as a matter of law that Mr. Jacobs willfully attempted to evade or defeat his taxes.

**I**

**A**

Mr. Jacobs, a real estate and transactional lawyer, has practiced in the Fernandina Beach, Florida, area since 1972.[2] He and his wife, Patricia Jacobs, have lived since December 1995 in a house on Amelia Island Plantation, a golfing resort community that offers amenities such as tennis courts, a spa, boutique-style shops, a golf club, and a grocery store. Many of Mr. Jacobs's clients also live in Amelia Island Plantation. Mrs. Jacobs's only assets when she married Mr. Jacobs were household furnishings and some artwork. She has never earned a significant amount of income during the marriage.

In the early 1990s, Mr. Jacobs established a law firm called Jacobs & Peters, P.A., which he subsequently re-named Arthur I. Jacobs, P.A. Mr. Jacobs testified that Arthur I. Jacobs, P.A. incurred federal tax debt and that, in 1995, it filed for

---

[2]The facts set forth in this section are drawn from Mr. Jacobs's own testimony before the Bankruptcy Court, and from facts the parties do not dispute.

bankruptcy "largely because of those tax debts." After the bankruptcy Mr. Jacobs reorganized the law firm and renamed it Jacobs & Associates, P.A. ("Jacobs & Associates"). Jacobs & Associates is a corporation, and Mr. Jacobs is its sole shareholder and sole officer.

Mr. Jacobs owes personal federal income tax for the years 1990-1995, 1997, and 1998.[3] Although Mr. Jacobs could have arranged for his law firms to treat him as a salaried employee, and withhold tax from his income, in those years, tax returns submitted by the Government show that his law firms instead characterized his income as officer compensation in 1991-1995, 1997, and 1998.[4] Because the income was so characterized, the firms did not withhold tax from Mr. Jacobs's compensation or pay withheld taxes on his behalf. The Government, however, submitted into evidence a document identified as a "certified official transcript" for the tax years 1989 through 1995, which shows two entries labeled "credit from withheld taxes & excess FICA" for, respectively, $76,911.25 on April 15, 1995 and $9,362 on April 15, 1996. The $9,362 amount is listed on Mr. Jacobs's 1995

---

[3]Mr. Jacobs paid his federal income taxes for the tax year 1996 in full before trial, thus waiving his claim for discharge as to that year.

[4]No tax returns were submitted into evidence for the tax year 1990. For each of the other tax years at issue in this case, the amount listed as "wages, salaries, [and] tips" on Mr. Jacobs's personal income tax return is equal to the amount listed as "[c]ompensation of officers" on Mr. Jacobs's law firm's return for the same year.

4

tax return as "[f]ederal income tax withheld." Mr. Jacobs testified that the $76,911.25 amount "was either withheld or we paid an estimate. I don't know exactly how it was done." He did not testify about the $9,362 amount, which apparently was also either withheld or paid by Mr. Jacobs to the IRS. In any event, the $9,362 amount was only a small portion of the tax due on Mr. Jacobs's reported adjusted gross income of $233,510 for the tax year 1995. No other withheld tax amounts are evidenced in the record.

In each of the pertinent tax years Mr. Jacobs requested two extensions of time to file his returns, and then filed his returns before the extension deadlines. In each of the relevant years except 1997, he failed to send any estimated tax payment with his extension application.[5] He filed his tax returns by the extension date each year, but without complete payment.[6] In the early 1990s, Mr. Jacobs's law firm sold a building it owned in Tallahassee, Florida and paid the proceeds to the IRS. Also in the early 1990s, Mr. Jacobs paid the IRS the proceeds from the sale of some bank stock he owned.

---

[5]The application for an automatic extension requires the taxpayer to pay the tax liability that he or she reasonably estimates is due.

[6]From 1990 through 1998, Mr. Jacobs paid approximately $200,000 in federal income taxes. Although it is undisputed that this amount is less than his full tax liability, the record is unclear as to the amount of the unpaid balance. In any event, the issue in this case is not the amount of the unpaid taxes but whether Mr. Jacobs willfully attempted to evade or defeat his taxes under § 523(a)(1)(C) so as to render that debt nondischargeable.

From 1997 to 2001, Mrs. Jacobs worked at a jewelry store in Fernandina Beach called Morton-Jacobs Jewelers, Inc. ("Morton-Jacobs"), a corporation. She was the corporation's sole shareholder, officer and director. In 2001, she sold Morton-Jacobs, including its inventory and business goodwill, for $80,000. Morton-Jacobs's business never was profitable.

Between 1998 and 2001, Mr. Jacobs and his law firms wrote a total of $44,900 in checks to Morton-Jacobs.[7] Of that amount, $8,400 was paid by Mr. Jacobs from his personal bank account. During the same period, Mr. Jacobs and Jacobs & Associates transferred an additional $119,056.87 to Morton-Jacobs, which Mr. Jacobs characterized as loans. Mrs. Jacobs never repaid the loans, even though Mr. Jacobs testified that she received a "dividend" of $22,231 from Morton-Jacobs after she sold the business in 2001. Mr. Jacobs testified before the Bankruptcy Court that he did not require his wife to pay back his loan to her because she spent a period of time caring for his terminally-ill sister. No documentation of that arrangement appears in the record.

---

[7]This amount includes $31,500 from Jacobs & Peters, P.A., $5,000 from Jacobs & Associates, and $8,400 from Mr. Jacobs. At trial, the Government introduced into evidence an exhibit consisting of copies of various checks written by Mr. Jacobs and his law firms to, *inter alia*, Morton-Jacobs, with an attached summary. The total of those checks is $47,312. However, one check included in that amount, for $2,412, is actually made out not to Morton-Jacobs but to "Martha Henderson."

In 1995, Mr. and Mrs. Jacobs bought the house on Amelia Island Plantation in which they currently live, for $525,000. Mr. Jacobs testified before the Bankruptcy Court that the mortgage company would not loan him the money to buy the house "because of [his] bad credit," but that it would loan the money to his wife. At trial and in his Rule 2004 examination, he testified that the mortgage company "did not want my name on the title" because "I had all the tax liens." Mr. Jacobs therefore signed the note and mortgage but deeded the home to his wife so that only her name appeared on the title. Mr. Jacobs made all the mortgage payments on the home himself, both on the initial mortgage and on a second mortgage the Jacobses subsequently obtained. They became signatories to the first mortgage, which was for thirty years and $595,000, in May 2002. Mr. Jacobs testified that the current mortgage indebtedness is approximately $660,000, that he gave the IRS most of the proceeds from one of the refinancings of the home, and that the home's current fair market value is approximately $800,000. The monthly mortgage payments, including taxes and insurance, total $4,500 per month. Mr. Jacobs testified, however, that no equity currently exists in the home.

Mr. Jacobs testified at length about his lifestyle in Amelia Island Plantation. He and Mrs. Jacobs belong to the Amelia Island Plantation Club, to which Mr. Jacobs pays approximately $1,600 per month. Mrs. Jacobs makes no contributions

7

to those payments. The Jacobses do "all [their] grocery shopping there," as well as all of their entertaining. Mr. Jacobs testified that some of the entertaining is purely personal, but that "a good part of it is business." He also testified that he plays golf at Amelia Island Plantation once a week, and pays between $250 and $285 per month for that privilege.

According to Mr. Jacobs's testimony, Mrs. Jacobs became very depressed in 2000 after an indictment unrelated to this case was filed against Mr. Jacobs. To help his wife, that same year Mr. Jacobs paid approximately $20,000 for her to receive cosmetic surgery "to correct what she considers imperfections on her face." At the time of trial, he was paying between $600 and $700 a month for Mrs. Jacobs to lease a 2001 or 2002 Mercedes-Benz automobile.

Between 1997 and 2003, the Jacobses obtained several vehicles, owned and paid for by Jacobs & Associates, which they used for personal purposes as well as for business. In 1997, Mr. Jacobs purchased a $36,001 Chrysler Town and Country minivan,[8] but the title was in the name of Jacobs & Associates. In 1997, Mr. Jacobs testified, he traded the Town and Country minivan for a Jeep.[9] At

---

[8]Mr. Jacobs is listed as the purchaser on the installment purchase contract.

[9]The record contains no evidence regarding whether title to the Jeep was in Mr. Jacobs's name or Jacobs & Associates's name, or who made the payments on it.

some later point, Jacobs & Associates bought a 1996 Suburban and a 2001 Suburban, both of which Mr. Jacobs drove for personal as well as business purposes. Mr. Jacobs testified that the 2001 Suburban was "financed in [Mrs. Jacobs's] name," but that Jacobs & Associates made the payments on it.

In 2003, Mr. Jacobs traded in the 2001 Suburban for a 2003 G.M.C. Yukon. Jacobs & Associates made all the payments on the Yukon, but the title was in Mrs. Jacobs's name because, Mr. Jacobs testified, the seller "would only put it in her name." Mrs. Jacobs has no rental or other agreement with Jacobs & Associates. Mr. Jacobs testified at trial that he drove the Yukon "exclusively," that he drove it for personal and business purposes, and that, because the Yukon had seven seats, it was "quite utilitarian for large groups of folks that [he] t[ook] around in [his] business."

Mr. Jacobs also made payments to organizations in 2000 and 2001. He paid approximately $12,152 to "Place of Encouragement," a charitable corporation Mr. Jacobs founded with one of his clients. Mr. Jacobs testified that he and the client "couldn't find a permanent home" for Place of Encouragement, so the client "gave me the old Alan Barton barbecue building." Mr. Jacobs further testified, "I took that building through the Place of Encouragement, and we leased it for . . . a dollar for fifty years, to Hope Ministries, and we'd conduct our own ministries." Mr.

9

Jacobs testified that, despite being a real estate attorney, he failed to search the building title and later discovered that "there were $26,000 owed in taxes." The $12,152 payment, he testified, was to help pay off that tax amount. In 1997, he made a $12,000 payment to the Amelia Island Chapel. He also donated "a couple thousand bucks" to an organization called the Preservation Institute of Nantucket, which he testified "train[s] students from around the country in historic preservation architecture."

Between 2002 and 2004, Mr. Jacobs paid thousands of dollars to his adult children. In May 2003 he gave $3,000 to his daughter Allison to help her pay off student loans from law school. He also gave $6,850 to his daughter Jennifer as repayment for loans she previously had made to him, plus a $3,000 gift "for the downpayment on a house." He also paid $5,000 to his son, Craig, to help him make a downpayment on a truck he needed for his work, and then made monthly payments of $450 on the truck for "a couple of years." Although Craig already had a car, Mr. Jacobs testified that the car "was an old, beat-up thing," that "would hardly get" where Craig needed to go. Mr. Jacobs also paid $6,200 to his stepson, Jason, for college expenses other than tuition or fees, and $1,000 to his son-in-law, Jake, upon his medical school graduation.

**B**

On July 15, 2003, Mr. Jacobs filed a Chapter 7 bankruptcy petition. He was granted a discharge under 11 U.S.C. § 727 from all dischargeable debts on January 8, 2004.[10] On February 3, 2004, Mr. Jacobs filed an adversary proceeding in the Bankruptcy Court, seeking a determination that his tax liabilities for the 1990-1995, 1997, and 1998 tax years were dischargeable. The Government argued that 11 U.S.C. § 523(a)(1)(C) excepted the tax liability for those years from discharge because Mr. Jacobs had willfully attempted to evade and defeat the tax.

After a bench trial, the Bankruptcy Court determined that Mr. Jacobs's tax liability was not excepted from discharge under § 523(a)(1)(C). (Bankr. Ct. Op. 8-10.) It reasoned that the Government had not carried its burden of proof as to § 523(a)(1)(C)'s "willfullness" element, because Mr. Jacobs "ha[d] portrayed a remorseful debtor with a white heart," "filed accurate returns each year [for the tax years in issue], voluntarily assessed himself with such tax debt, and paid, during the years 1990 through 1998, approximately $200,000 in income taxes to the

_____

[10]11 U.S.C. § 727(b) provides:

Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title.

11

government." *Id.* at 8. The Bankruptcy Court further reasoned that §

523(a)(1)(C)'s "conduct" element, which the Bankruptcy Court stated required

"evidence of actual evasion," was not satisfied, because Mr. Jacobs's payments to

family members and charities instead of the IRS during the years in question

"d[id] not rise to the level of willful evasion." *Id.* at 10.  The Bankruptcy Court

distinguished Mr. Jacobs's case from *In re Landi*, 316 B.R. 363 (Bankr. M.D. Fla.

2004), on the basis that "unlike the court in *Landi*, this Court does not find that the

plaintiff engaged in a fraudulent scheme to avoid or evade paying his taxes." *Id.*

The Bankruptcy Court also distinguished Mr. Jacobs's case from *In re Griffith*,

206 F.3d 1389 (11th Cir. 2000), *cert. denied*, 531 U.S. 826 (2000), on the basis

that "[u]nlike *Griffith*, in the instant case, the government failed to proffer any

evidence of fraud or evidence that the Plaintiff concealed or transferred assets

while still maintaining control over the property." *Id.*   The Bankruptcy Court

therefore held Mr. Jacobs's tax liability dischargeable.  The Government timely

appealed to the District Court.

## C

The District Court reversed the Bankruptcy Court's judgment that Mr.

Jacobs's tax liabilities were discharged.  It held that the Bankruptcy Court had

erred in construing § 523(a)(1)(C) to require "actual evasion," as opposed to any

12

"affirmative acts of commission or omission, which actually or constructively would serve to evade or defeat a tax." (Dist. Ct. Op. 17.) The District Court further held that the Bankruptcy Court had erred in construing § 523(a)(1)(C) to require "a showing that the debtor 'engaged in a fraudulent scheme,'" or "'of fraud or evidence that the Plaintiff concealed or transferred assets while maintaining control over the property.'" *Id.* at 18. The District Court determined that § 523(a)(1)(C)'s conduct element was met, because:

> Mr. Jacobs filed chronically late tax returns; he failed to pay his mounting tax obligations; he made many intra-family gifts; he and his closely held professional associations made substantial monetary transfers to his wife's business; he used his firm to pay for his personal transportation; he failed to properly report wage income; he titled property in his wife's name to frustrate tax collection efforts; and he made the decision to engage in outrageously lavish spending while ignoring his tax obligations.

*Id.* at 27.

The District Court rejected as clearly erroneous the Bankruptcy Court's conclusion that § 523(a)(1)(C)'s willfulness requirement was not met. It concluded that Mr. Jacobs's conduct displayed multiple "badges of fraud" relevant to the willfulness inquiry, including unreported loans from his law firm, intra-family transfers, reporting of wage as non-wage income, transfers of money from

13

his firm to his wife's business, and titling property in his wife's name. *Id.* at 30-33. Mr. Jacobs has timely appealed from the District Court's decision to this Court.

**II**

Mr. Jacobs argues in this appeal that the Bankruptcy Court applied the correct legal standard for willfulness - i.e. "a mental state higher than mere intentional nonpayment, and, arguably, as high as fraudulent intent," (Initial Br. of Appellant 32) and that the District Court erred in concluding to the contrary. He further argues that the Bankruptcy Court did not clearly err in finding that his conduct did not warrant exemption from discharge under § 523(a)(1)(C). We disagree.

"As the 'second court of review of a bankruptcy court's judgment,' this Court examines independently the factual and legal determinations of the bankruptcy court and employs the same standards of review as the district court." *In re Isaac Leaseco, Inc.*, 389 F.3d 1205, 1209 (11th Cir. 2004) (quoting *In re Club Assoc.*, 951 F.2d 1223, 1228 (11th Cir. 1992)). "We review the bankruptcy court's factual findings under the clearly erroneous standard." *In re Fretz*, 244 F.3d 1323, 1326 (11th Cir. 2001) (quoting *Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1494 (11th Cir. 1997)). Whether or not a debtor

willfully attempted to evade or defeat a tax is a question of fact reviewable for clear error. *Dalton v. I.R.S.*, 77 F.3d 1297, 1302 (10th Cir. 1996). "By contrast, conclusions of law, whether from the bankruptcy court or the district court, we review *de novo*." *Fretz*, 244 F.3d at 1326 (quoting *Yale Materials*, 119 F.3d at 1494).

## A

A Chapter 7 debtor generally receives a discharge from all debts that arose before he or she filed the bankruptcy petition. *Id.*; 11 U.S.C. § 727(b). However, Congress has provided certain exceptions to the discharge. The exception relevant to this case appears in 11 U.S.C. § 523(a)(1)(C), which deems nondischargeable "any debt . . . for a tax . . . with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C).[11] "The Government bears the burden to prove, by a preponderance of the evidence, that a particular claim is nondischargeable under § 523(a)." *Griffith*, 206 F.3d at 1396.

---

[11] 11 U.S.C. § 523(a)(1)(C) provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt⁻
>    (1) for a tax . . .
>        (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax . . .

Section 523(a)(1)(C) "contains a conduct requirement (that the debtor 'attempted in any manner to evade or defeat [a] tax'), and a mental state requirement (that the attempt was done 'willfully')." *Fretz*, 244 F.3d at 1327. "The government satisfies the conduct requirement when it proves the debtor engaged in affirmative acts to avoid payment or collection of the taxes," *In re Gardner*, 360 F.3d 551, 558 (6th Cir. 2004), either through commission or culpable omission. *Fretz*, 244 F.3d at 1329-30. The mental state requirement - willfulness - is satisfied where the government shows that the debtor's attempt to avoid tax liability was "done voluntarily, consciously or knowingly, and intentionally." *Id.* at 1330. That standard is met where "(1) the debtor had a duty under the law, (2) the debtor knew he had that duty, and (3) the debtor voluntarily and intentionally violated that duty." *Griffith*, 206 F.3d at 1396.

In *In Re Haas*, 48 F.3d 1153 (11th Cir. 1995), *overruled in part by Griffith, 206 F.3d 1389, Griffith*, and *Fretz*, this Court elaborated on what type of conduct suffices for nondischargeability under § 523(a)(1)(C). This Court held in *Haas* that "a debtor's failure to pay his taxes, alone, does not fall within the scope of section 523(a)(1)(C)'s exception to discharge in bankruptcy." *Haas*, 48 F.3d at 1158. In *Haas*, this Court rejected the IRS's argument that a tax liability is nondischargeable under § 523(a)(1)(C) "if a debtor had both an awareness of his

16

duty to pay his taxes and the present ability to pay them but nonetheless failed to satisfy that duty," *id.* at 1155, reasoning that "[u]nder the IRS's interpretation . . . the only honest debtor would be a debtor who is wholly unaware of her debt to the IRS . . . A literal application of the government's 'plain language' interpretation of section 523(a)(1)(C) would thus render the general rule of dischargeability of tax liabilities an empty letter and defeat the central purpose of the Bankruptcy Code." *Id.* at 1156. This Court further held in *Haas* that "[a]bsent explicit language . . . the phrase 'attempt[s] in any manner to evade or defeat such tax' does not imply attempts to evade or defeat *payment* thereof," but only attempts to evade or defeat assessment. *Id.* at 1159.

In *Griffith* this Court, sitting *en banc*, overturned *Haas*'s second holding: that § 523(a)(1)(C) does not apply to attempts to evade or defeat payment, as opposed to assessment, of a tax. *Griffith*, 206 F.3d at 1393, 1395. This Court "reaffirm[ed]," however, "the primary holding of *Haas* that mere nonpayment of taxes, without more, does not constitute a willful attempt to evade or defeat taxes under § 523(a)(1)(C)." *Id.* at 1395. This Court affirmed the Bankruptcy Court's holding that the debtor, Griffith, willfully attempted to evade or defeat payment of his taxes. *Id.* at 1396-97. Section 523(a)(1)(C)'s conduct element was satisfied, this Court held, because "[i]t [was] undisputed that Griffith engaged in intra-

17

family transfers of property for little to no consideration." *Id.* at 1396. The willfulness element was also satisfied, this Court held, because Griffith knew he had a duty to pay taxes and his conduct "implicated several badges of fraud." *Id.*

In *Fretz*, this Court addressed the question "whether a debtor's intentional failure to file tax returns and to pay taxes owed to the Internal Revenue Service ("IRS") is sufficient, even without any supporting affirmative conduct, to show that he 'willfully attempted in any manner to evade or defeat [a] tax,' within the meaning of . . . § 523(a)(1)(C)." *Fretz*, 244 F.3d at 1324-25. The Court held that it was, reasoning that "[the taxpayer's] failure to file returns distinguishes his situation from that of the debtor in *Haas* who did file returns each year, as required." *Id.* at 1329. Failure to file tax returns and to pay taxes satisfied § 523(a)(1)(C)'s conduct requirement, this Court held in *Fretz*, because "[s]ection 523(a)(1)(C)) does not contain an affirmative conduct requirement," and "the modifying phrase 'in any manner' . . . covers attempts to evade or defeat a tax whether accomplished by 'acts of culpable omission [or] acts of commission.'" *Id.* at 1329 (citing *In re Fegeley*, 118 F.3d 979, 983 (3d Cir. 1997)). The Court held that Fretz had acted wilfully in failing to pay taxes or file returns, because "[t]here is no evidence that [his] failure to file returns and pay taxes was due to inadvertence or mistake . . . ." *Id.* at 1331.

**B**

Mr. Jacobs contends that the District Court erred in concluding that he was exempt from discharge under § 523(a)(1)(C) because (1) willfulness cannot be predicated on a taxpayer's payments or transfers to third parties, where the taxpayer retains no interest in the transferred property; and (2) because he filed his tax returns each year by the extension deadline, he is subject to a heightened mens rea standard under § 523(a)(1)(C). As explained below, he is incorrect on both points.

**1**

First, Mr. Jacobs maintains that "willfulness . . . can only be found from conduct whereby the debtor conveys value away from the government but continues to derive actual or potential benefit from it . . . ." (Initial Br. of Appellant 30.) He argues that "[t]he material difference between the debtor's conduct in *Haas* and the conduct in *Griffith* is that the debtor continued to derive actual or potential ongoing benefit from the assets in the one case but not in the other." *Id.* at 29. Mr. Jacobs argues that because he merely made payments to family members and organizations, without retaining any interest in the funds

19

paid, the Bankruptcy Court correctly found his debts fell outside § 523(a)(1)(C)'s exception to dischargeability.

Mr. Jacobs's argument is unsupported by authority. In *Haas*, this Court held that § 523(a)(1)(C)'s exception to discharge could not be invoked by "a debtor's failure to pay his taxes, alone . . . ." *Haas*, 48 F.3d at 1158. In *Griffith*, this Court held that the debtor was subject to § 523(a)(1)(C)'s discharge exception where the debtor transferred various assets to himself and his fiancee as tenants in the entirety "for inadequate consideration." *Griffith*, 206 F.3d at 1396. This Court has interpreted *Griffith* as holding that "the conduct requirement is satisfied . . . where a debtor engaged in *affirmative acts* to avoid payment or collection of taxes as the debtor in *Griffith* did." *Fretz*, 244 F.3d at 1329 (emphasis added).

Nothing in *Haas*, *Griffith*, or *Fretz* precludes such "affirmative acts" from consisting of transfers where no interest in the transferred property is retained. "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation." *Fretz*, 244 F.3d at 1327 (quoting *Dalton v. I.R.S.*, 77 F.3d 1297, 1301 (10th Cir. 1996)). Indeed, the court in *In re Hassan*, 301 B.R. 614 (S.D. Fla. 2003), concluded that a debtor's tax liabilities were not dischargeable under § 523(a)(1)(C), in part because the debtor made significant

20

loans to his daughter for no documented consideration, and spent large sums on luxury items instead of paying his taxes. *Id.* at 620-21.

**2**

Mr. Jacobs further argues that "this Court's holding in *In re Fretz*, 244 F.3d 1323 (11th Cir. 2001) - that the government, in order to prove . . . willfulness . . . need show only that . . . the failure to pay is not the result of mere inadvertence – must apply only . . . where the debtor fails to timely file tax returns." (Initial Br. of Appellant 30.) Where a debtor does timely file tax returns, Mr. Jacobs argues, § 523(a)(1)(C)'s dischargeability exception requires "a mental state higher than mere intentional nonpayment, and, arguably, as high as fraudulent intent." *Id.* at 32. He contends that, "[b]ecause [he himself] timely filed his tax returns, the [heightened] standard for establishing willfulness set forth in *Haas* and *Griffith*, rather than that set forth in *Fretz*, should control in this appeal." *Id.* at 33.

To the extent Mr. Jacobs reads *Haas* and *Griffith* to hold that timely filing of tax returns elevates § 523(a)(1)(C)'s mental state requirement to fraud or something above intent, he is incorrect. In *Griffith*, where the debtor timely filed his tax returns, this Court stated that § 523(a)(1)(C)'s willfulness requirement is met where "'(1) the debtor had a duty under the law, (2) the debtor knew he had that duty, and (3) the debtor *voluntarily and intentionally* violated that duty.'"

21

*Griffith*, 206 F.3d at 1396 (quoting *Matter of Bruner*, 55 F.3d 195, 197 (5th Cir. 1995)) (emphasis added). Although the evidence in *Griffith* was "sufficient to justify a finding of fraud and, thus, to support the finding that Griffith's conduct was willful," *id.* at 1396-97, the *Griffith* court did not state that fraud was required in every case where the debtor files timely returns. Nor did this Court limit its statement in *Fretz* that "fraudulent intent is not required," *Fretz*, 244 F.3d at 1330, to instances in which a debtor has failed timely to file tax returns.

Mr. Jacobs is also mistaken in asserting that the mental state standard announced in *Fretz* differs from that set forth in *Haas* and *Griffith*. Although this Court did suggest in *Fretz* that "inadvertent mistakes" are insufficient to trigger § 523(a)(1)(C)'s exception to dischargeability, it also made clear that the necessary trigger is knowledge and deliberateness: this Court explained in *Fretz* that "[t]he third or willfulness component of [§ 523(a)(1)(C)'s] mental state requirement 'prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are *knowing and deliberate*.'" *Fretz*, 244 F.3d at 1330 (citing *In re Birkenstock*, 87 F.3d 947 (7th Cir. 1996)) (emphasis added). *Fretz*' "knowing and deliberate" standard is functionally equivalent to the "voluntar[y] and

intentional[]" standard set forth in *Griffith*. That standard applies whether or not a taxpayer timely files tax returns.

## 3

Mr. Jacobs also argues that the District Court erroneously concluded that the Bankruptcy Court applied an incorrect legal standard to § 523(a)(1)(C)'s conduct prong. The District Court criticized the Bankruptcy Court for requiring evidence of "actual" evasion, (Dist. Ct. Op. 16-17) and "a showing that the debtor 'engaged in a fraudulent scheme,'" *id.* at 18, and accused the Bankruptcy Court of "impermissibly engraft[ing] a mental state requirement on [§ 523(a)(1)(C)'s] 'conduct' inquiry." *Id.* at 19. According to Mr. Jacobs, the Bankruptcy Court in fact applied the correct legal standard because it "considered - in addition to fraudulent conduct . . . whether the record showed 'evidence of actual evasion,' or other 'affirmative acts sufficient to satisfy the conduct requirement . . .'" and because it cited *Griffith*. (Initial Br. of Appellant 45.)

Mr. Jacobs's dispute with the District Court concerns the following statement in the Bankruptcy Court's order: "to satisfy the conduct requirement under § 523(a)(1)(C), the government must proffer evidence of actual evasion. In determining whether there is evidence of actual evasion, a Court analyzes whether a debtor has engaged in affirmative acts constituting a willful attempt to evade or

23

defeat payment of taxes." (Bankr. Ct. Op 8) (citation omitted). The Bankruptcy Court then analyzed whether the government had shown "badges of fraud." *Id.* It concluded that Mr. Jacobs had not engaged in "actual evasion" because "the ability to pay one's taxes and electing not to do so, by itself, does not constitute evasion" and "this Court does not find that the Plaintiff engaged in a fraudulent scheme in order to avoid or evade paying the taxes." *Id.* at 10.

As the District Court found, the Bankruptcy Court's approach was erroneous in two respects. First, § 523(a)(1)(C)'s conduct prong is separate from its "willfulness" prong, *Griffith*, 206 F.3d at 1396, and the conduct prong does not itself include a willfulness inquiry. Rather, "[t]he conduct requirement is satisfied . . . where a debtor engages in affirmative acts to avoid payment or collection of taxes . . . ." *Fretz*, 244 F.3d at 1329. Second, the Bankruptcy Court appears to have required a showing of fraud or "a fraudulent scheme" to satisfy the conduct requirement. Such a fraud analysis contravenes this Court's statement in *Fretz* that "[f]raudulent intent is not required" for § 523(a)(1)(C)'s mental state prong. *Fretz*, 244 F.3d at 1330. The Bankruptcy Court therefore applied an incorrect legal standard for nondischargeability under §523(a)(1)(C).

**C**

24

Mr. Jacobs further asserts that the District Court improperly "made independent factual findings" contrary to those of the Bankruptcy Court. He specifically takes issue with the District Court's conclusion that he failed timely to file his tax returns and that he owed an amount "exceeding $600,000," and criticizes the District Court for "mak[ing] reference to [his] home as if it were 'valuable' property having equity . . . ." (Initial Br. of Appellant 41-44.) He maintains that the District Court should have accepted the Bankruptcy Court's finding that he, like the debtor in *Haas*, did nothing more than fail to pay his taxes.

**1**

The record overwhelmingly shows that Mr. Jacobs willfully attempted to evade or defeat his taxes within the meaning of § 523(a)(1)(C). The Bankruptcy Court clearly erred in concluding to the contrary.

First, the undisputed evidence shows that § 523(a)(1)(C)'s conduct requirement is satisfied. Mr. Jacobs admits that he and his wife purchased a home in 1995, after he been accumulating tax debt for several years, and titled it solely in his wife's name while he remained on the mortgage, because the mortgage

company wanted to avoid the attachment of tax liens.[12]  Mrs. Jacobs had essentially no income or assets, and Mr. Jacobs made all the mortgage payments on the home himself.  Placing title to significant assets in the names of family members, while remaining on the mortgage, qualifies as an affirmative act to evade or defeat tax payments under § 523(a)(1)(C).[13]  *See United States v. Hook*, 781 F.2d 1166, 1168, 1171-72 (6th Cir. 1986) (appellant was properly convicted of willfully attempting to evade or defeat a tax under I.R.C. § 7201 where he, *inter alia*, purchased a home in his girlfriend's name but paid the installments on the mortgage note and obtained the proceeds from the sale of the house himself); *In re Klayman*, 333 B.R. 695, 700-02 (Bankr. E.D. Pa. 2005) (tax debt not

---

[12]  Mr. Jacobs asserts that placing title to the home in his wife's name was not an affirmative act to avoid payment or collection of taxes because he did it "at the insistence of the mortgage lender." (Reply Br. of Appellant 4.)  Regardless of whether it was Mr. Jacobs or the mortgage company who initially came up with the idea to put the title in Mrs. Jacobs's name, however, Mr. Jacobs concedes that the purpose of titling the house in his wife's name was to prevent his tax liens from attaching to it.

[13]  Mr. Jacobs stresses that the Bankruptcy Court disregarded his "decision to title his home . . . in his wife's name," on the basis that "the home had no equity." (Initial Br. of Appellant 28.)  However, the fact that the home had no "equity" at the time of trial in 2004 is irrelevant to whether Mr. Jacobs's titling of the home in his wife's name was an affirmative act to evade or defeat payment of his taxes in 1995.  Mr. Jacobs already had incurred much of the tax liability at issue in this case when he purchased the home, and he titled it in his wife's name to prevent his tax liens from attaching to it.  *See In re Birkenstock*, 87 F.3d 947, 952 (7th Cir. 1996) (bankruptcy court justifiably determined that debtors' transfer of home and corporate stock to a trust, while continuing to live in the home rent-free and continuing personally to guarantee loans and pay expenses concerning the trust property, was an attempt to evade or defeat their personal income tax liabilities).

dischargeable where debtor transferred title to real property by deeding it to himself and his wife "by the entireties for consideration of $1.")

Also highly relevant to the conduct requirement is the undisputed evidence that Mr. Jacobs caused his law firms to characterize his earnings as officer compensation not subject to tax withholding, and then failed to pay estimated taxes on those earnings. He admits that his law firms failed to withhold taxes from the compensation they awarded him in the years in question, that he could have caused them to withhold tax from his earnings but did not do so, and that the law firms purchased numerous luxury vehicles that he and his wife used in part for personal purposes. Title to at least one of those vehicles, the 2003 G.M.C. Yukon, was in Mrs. Jacobs's name, and Mr. Jacobs testified that the 2001 Suburban "was financed in [Mrs. Jacobs's] name," but all the payments for the purchase of those vehicles were made by Mr. Jacobs's firms. Characterization of earnings as non-wage income, without paying quarterly estimated taxes, and use of business entities to pay personal expenses, constitute affirmative attempts to conceal assets under § 523(a)(1)(C). *Gardner*, 360 F.3d at 559 (debtor's use of nominee accounts to pay personal expenses supported the bankruptcy court's determination that debtor attempted to evade or defeat payment of his tax liabilities); *In re Fegeley,* 118 F.3d 979, 984 (3d Cir. 1997) (stating in dicta that debtor's "changing

27

of filing status from that of employee to independent contractor . . . more properly may have been construed as affirmative steps in a scheme to evade taxes [than as relevant omissions]");  *Landi v. United States*, 316 B.R. 363, 369-70 (M.D. Fla., 2004), *aff'd without opinion*, 138 Fed. Appx. 300 (11th Cir. 2005) (upholding bankruptcy court's determination that "the Government has sustained its burden of proving that the [d]ebtors purposefully evaded the payment of taxes" where the debtors commingled their personal funds with those of their professional corporation, and characterized earnings from the corporation as non-wage income without filing quarterly tax returns or paying estimated taxes.).

Section 523(a)(1)(C)'s conduct requirement is further satisfied by Mr. Jacobs's large discretionary expenditures.  In 2000 and 2001, Mr. Jacobs donated approximately $12,152 to the Place of Encouragement, and in 1997 he paid $12,000 to the Amelia Island Chapel.  He made thousands of dollars' worth of gifts to his children.  It is also undisputed that Mr. Jacobs made large payments for luxury items, such as approximately $20,000 for plastic surgery for his wife in 2000, over $1,000 per month for a golf club membership and entertaining expenses, and between $600 and 700 per month for a leased Mercedes-Benz for

28

his wife, even though the Jacobses apparently also drive other luxury vehicles.[14]

Such large discretionary expenditures, when a taxpayer knows of his or her tax liabilities, is capable of meeting them, but does not, are relevant to § 523(a)(1)(C)'s conduct element. *Hassan*, 301 B.R. at 622.

**2**

Mr. Jacobs further argues that "reduced to his essence, [his] conduct is nothing more than failure to pay taxes. Like the debtor in *In re Haas*, he earned income and failed to withhold from it or pay the full tax on it." (Reply Br. of Appellant 5.) *Haas* is readily distinguishable from Mr. Jacobs's case. In *Haas*, the debtor's only relevant conduct was "us[ing] his income to pay his personal and business debts rather than his tax liability." *Haas*, 48 F.3d at 1154. Here, not only did Mr. Jacobs use his income to pay personal and business debts instead of taxes, he also took title to a home in his wife's name, caused his law firms to characterize his earnings as officer income without paying estimated tax on those earnings, made substantial loans to his wife's business for no documented consideration, and made very substantial expenditures despite knowing he owed federal income taxes. *Haas*' rule that "Congress did not intend that a failure to pay taxes, without

---

[14] Although Mr. Jacobs testified that the vehicles and entertaining were necessary to his law and lobbying business, he did not contend that he could not have conducted his business in a less lavish manner.

29

more, should result in the nondischargeability of a debtor's tax liabilities in bankruptcy," *id.* at 1157, therefore does not control the outcome of this case.

**3**

The Bankruptcy Court also clearly erred in determining that Mr. Jacobs did not act willfully. Mr. Jacobs's characterization of his earnings from his law firms as officer income not subject to withholding, his failure to pay estimated taxes, and his firms' loans to Morton-Jacobs for undocumented consideration, strongly indicate willfulness. *Hassan*, 301 B.R. at 620-22 (S.D. Fla. 2003) (debtor's large and unexplained transfers of money to family members, allegedly as repayment for loans, without documented consideration, indicated willfulness). At the very least, the evidence shows that Mr. Jacobs's failure fully to pay his taxes, while making such large loans and expenditures, was done "voluntarily, consciously or knowingly, and intentionally." *Fretz*, 244 F.3d at 1330; *see also Gardner*, 360 F.3d at 561 (debtor willfully avoided payment of his tax liabilities where he acknowledged that he was aware of his legal responsibility to pay the taxes and could have used some of his earnings to do so, but "made a conscious decision not to apply the monies [he earned] toward his tax debt.").

The Bankruptcy Court's finding that Mr. Jacobs regretted not paying his taxes does not suffice to defeat a finding of willfulness. *See Fretz*, 244 F.3d at

30

1331 (debtor willfully acted to evade taxes notwithstanding his regret over failing to file). Nor does its finding that Mr. Jacobs paid a portion of his tax liability: paying some of the tax liability owed does nothing to show that a debtor's failure to make full payment was not voluntary or intentional. *Landi*, 316 B.R. at 367 (attempt to evade or defeat taxes was willful even though the debtors paid approximately $200,000 out of an approximately $1.13 million liability); *Hassan*, 301 B.R. at 617 (attempt to evade or defeat was willful despite the debtors' payment of $226,221 of a $569,576 liability). Because the Bankruptcy Court erroneously found that Mr. Jacobs did not act willfully, and failed to address the evidence supporting a finding of willfulness, it clearly erred in concluding Mr. Jacobs did not willfully attempt to evade or defeat his taxes.

## Conclusion

Because the Bankruptcy Court applied an incorrect legal standard, and clearly erred in concluding that Mr. Jacobs did not willfully attempt to evade or defeat taxes, we will affirm the District Court's decision reversing the judgment of the Bankruptcy Court that Mr. Jacobs's tax liabilities for the years 1990 through 1995, 1997, and 1998 are discharged.