In re Mark Wade **LINDROS**, Debtor.

Mark Wade Lindros, Plaintiff,

v.

**United States of America, Internal Revenue Service, Defendant.**

**Bankruptcy No. 04–16558–8W7.**
**Adversary No. 8:08–ap–00140–MGW.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Nov. 2, 2011.

---

Keith H. Johnson, Johnson and Johnson P.A., Jacksonville, FL, for Plaintiff.

Katherine P. Walsh, U.S. Department of Justice, Tax Division, Washington, DC, for Defendant.

*FINDINGS OF FACT AND CONCLU-SIONS OF LAW ON THE PLAIN-TIFF'S COMPLAINT TO DETER-MINE DISCHARGEABILITY OF TAXES*

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

This case involves the Plaintiff's entitlement to a discharge from his 2000 tax liability. Under Bankruptcy Code § 523,[1] a debtor is not entitled to a discharge from any taxes that he willfully attempted to evade or defeat. In 2000, the Plaintiff incurred a significant tax liability resulting from substantial gains in the stock market that were treated as ordinary income. He failed to pay his 2000 tax liability because he believed it could be offset by capital losses in later years. He was wrong. By the time he discovered it, however, he had lost all of his wealth in the stock market crash, and he ended up filing for bankrupt-cy two years later. In light of these facts, and for the reasons set forth below, the Government failed to prove by a preponderance of the evidence that the Plaintiff voluntarily, consciously or knowingly, and intentionally engaged in affirmative acts to avoid the payment or collection of taxes. Accordingly, the Court will enter final judgment in favor of the Plaintiff determining that his 2000 tax liability is dischargeable.

**Findings of Fact**

The Plaintiff in this action is the Debtor, Mark Wade Lindros ("Lindros"). Lindros graduated from high school in 1988 and attended one semester at Middlesex Community College. Lindros had no high school, college, or other formal background or education in finance, accounting, taxes, or tax return preparation.[2]

After dropping out of college, Lindros worked construction and various other jobs for the next six years.[3] Then, in March 1994, Lindros began working for the Information Management Company ("IMC"). He started out as a clerk in the mail room doing licensing and shipping.[4] After a while, he was promoted to technical support engineer.[5]

In October 1995, BEA Systems ("BEA") bought IMC. At the time BEA acquired IMC, Lindros was still a technical support engineer. He was later promoted to a consultant. His job duties as a consultant involved helping BEA's customers implement its products and applications. This type of work involved highly technical components of infrastructure software programming.[6] It also involved significant travel. Over the years, Lindros continued

---

1. 11 U.S.C. § 523(a)(1)(c).

2. Doc. 16, p. 74, ll. 3–8.

3. *Id.* at p. 9, ll. 7–13.

4. *Id.* at p. 9, l. 21—p. 10, l. 7.

5. *Id.* at p. 10, ll. 8–10.

6. *Id.* at p. 10, l. 11—p. 11, l. 6.

to be promoted through the ranks, and as he progressed, Lindros received steady pay increases.[7]

When BEA bought IMC, it provided its employees incentive stock options ("ISO's") with a four-year vesting period. The ISO's vested at 25% after one year and then on a pro rata basis thereafter through the 48th month of the option period.[8] Once the shares were vested, Lindros could exercise the option by paying the "strike price," which was the fair market value of the shares at the time the ISO's were granted. Lindros could pay the option price by liquidating some of his shares. For example, if the stock value had doubled between the date of the grant and the exercise of the option, then approximately one-half of the shares would be liquidated to pay for the shares, and Lindros would receive the balance to hold, sell, or do with as he chose.[9] The option period for the ISO's extended 10 years from the grant of the option.[10]

Lindros first began exercising his stock options in 1999. Lindros witnessed and partially experienced the growth of a bull stock market throughout the 1990s.[11] Because he did not hold the stock for more than a year, however, he lost the more favorable long-term capital gains treatment. As a consequence, he received $20,947.30 of disqualifying dispositions from the sale of the ISO's during the 1999 tax year.[12]

The growth of the stock market continued into 2000. BEA Systems stock traded at a high of approximately $89.00 per share during 2000, while the option price, which varied, was approximately $20.00 per share.[13] Based upon the value of his existing and future ISO's, Lindros was a millionaire throughout 2000. Had the stock retained its value, the aggregate value of Lindros' existing stocks and future ISO's would have run into the millions of dollars.[14]

During the 2000 tax year, Lindros successfully traded his stock and reported an overall combined short-term and long-term capital gain of $401,380 for the taxable year.[15] The amount of his disqualifying dispositions increased to $418,647.95 for that year.[16] During 2000 and continuing into 2001, Lindros enjoyed his newfound riches. In 2000, he leased a 2001 Porsche Boxster S with a $10,000 down payment. In January 2001, he bought a house in Florida and put down a $20,000 deposit on a Ferrari. Sometime in 2001, he purchased a Nissan Xterra.[17] These cars were in addition to the 1999 Ford Expedition and a Yamaha FZR 6000 recreational motorcycle Lindros bought in 1999. Over that time, he also spent $2,250 on flying lessons, $3,000 on elective eye surgery, $5,000 on cycling equipment, $2,000 on a kayak, $4,500 on a pool table, and $6,000 on a game room. He enjoyed several nice vacations during that time frame as well.

7.  *Id.* at p. 11, ll. 10–15.

8.  *Id.* at p. 11, l. 16—p. 12, l. 1.

9.  *Id.* at p. 12, l. 4—p. 13, l. 24.

10. Doc. 16, p. 12, l. 25—p. 13, l. 2; Pl. Ex. 10.

11. Doc. 16, pp. 22, ll. 18–25; Doc. 17, p. 48, ll. 5–13.

12. Pl. Ex. 1.

13. Doc. 16, p. 23, l. 1—p. 24, l. 5; Pl. Ex. 10.

14. Doc. 16, p. 20, ll. 9–13; p. 22, ll. 11–25; Pl. Ex. 10.

15. Pl. Ex. 1; Doc. 16, p. 21, ll. 22–24.

16. Pl. Ex. 2; Doc. 16, p. 19, ll. 16–18.

17. Doc. 16, p. 44, ll. 19–23.

But Lindros' luck began to run out in 2001. With the crash of the tech stock boom and the September 11 tragedy, the value of his ISO's decreased significantly in 2001. The BEA Systems stock, which had traded at a high of $89.00 per share in 2000, was worth substantially less than $20.00 per share—less than Lindros' option price. Shortly after September 11, 2001, the stock price dropped to a low of approximately $4.00 per share.[18] The significant gains from the stock transactions had been lost in the stock market and, to a lesser extent, spent on his personal living expenses. Lindros ultimately experienced a $651,682.00 loss in tax year 2001.

He also learned in 2001 that he had a significant tax liability from the 2000 tax year. Lindros, however, was not concerned about his 2000 tax liability. He had conducted his own internet research, and based on that research, he was under the impression—albeit mistaken—that he could carry back his 2001 capital losses to offset his positive 2000 capital gains.[19] He also believed that the stock market would rebound and that he would have sufficient assets to pay any tax liability.

Nevertheless, he began curbing his expensive lifestyle. As Lindros' luck in the stock market began to deteriorate, he cancelled his Ferrari order, although the return of his $20,000 deposit never materialized. Lindros later sold his New Jersey home in October or November of 2001 and moved full time to Florida. He felt that he could not continue to maintain two homes. So he elected to live in Seminole, Florida, since Florida has no state income tax.[20]

In 2002, Lindros learned that he could not offset his 2000 tax liability with his 2001 capital losses. In fact, he was limited to a $3,000 capital loss for the 2001 tax year, and he actually incurred a $47,355.00 alternative minimum tax. By that time, though, most of Lindros' fortune had disappeared. It was at that time that he realized he would have difficulty paying his 2000 tax liability. So Lindros paid $50,000 in taxes to the State of New Jersey under an amnesty plan, and then in late 2002, he initiated contact with the IRS's Automated Collection System ("ACS").[21]

The purpose of this call was to work out a monthly payment agreement with the IRS. But the ACS representative advised Lindros that the amount he owed was too high for ACS to handle and that he would need to wait until he was contacted by a local Revenue Officer. After a few months, Lindros was contacted by Revenue Officer Bryan Morris. Mr. Morris sent Lindros a letter setting a date and time for an appointment. Because of his business travels, however, Lindros did not receive the notice until after the appointed time.

When he did speak with Mr. Morris, it did not go well. Mr. Morris requested significant financial information from Lindros. Although Lindros provided that information to Morris (both personally and through his representatives), the IRS nevertheless levied Lindros' bank accounts and his wages numerous times over the next two years. Those collection efforts ultimately led to Lindros filing bankruptcy on August 20, 2004.[22] The bankruptcy filing was a direct result of the parties' failure to reach an agreement as to an amount

---

18. Doc. 17, p. 49, ll. 6–22.

19. Doc. 16, p. 20, ll. 9–13; p. 22, ll. 11–25; p. 28, l. 10—p. 29, l. 15; p. 79, ll. 6–17.

20. *Id.* at pp. 47 & 48.

21. Doc. 16, p. 48, l. 15—p. 49, l. 5; p. 106, l. 12—p. 107, l. 4; Doc. 17, p. 50, ll. 13–18.

22. Doc. 16, p. 49, l. 6—p. 62, l. 20; Doc. 17, pp. 55–58.

for an installment payment agreement and the levies served on Lindros' wages, various bank accounts, and various stock brokerage accounts in late July 2004. Mr. Morris had also threatened to levy upon Lindros' remaining ISO stocks and pension funds held with BEA Systems.[23]

In the meantime, Lindros moved to Belize. By moving to Belize, Lindros believed he was eligible for an $80,000 foreign income exclusion under 26 U.S.C. § 911(a). He also believed that the foreign income exclusion, coupled with Belize's very low cost of living, could free up additional funds for an installment payment agreement.

Lindros ultimately received his chapter 7 discharge on November 29, 2004. He assumed his discharge included his 2000 tax liability and that he only owed a smaller liability for tax year 2001, which was excepted from discharge as a priority tax.[24] The IRS, however, continued its efforts to collect Lindros' 2000 tax delinquency. As a consequence, Lindros filed this adversary proceeding to determine the dischargeability of his 2000 tax liability. A two-day trial was held on September 29 and 30, 2008. The sole issue before the Court was whether Lindros was entitled to a discharge from his 2000 tax liability.

## Conclusions of Law

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

### The Exception to Discharge for Unpaid Taxes

■ A chapter 7 debtor generally is entitled to a discharge from all pre-petition debts.[25] That discharge, however, is intended only to give a "fresh start" to the "honest but unfortunate debtor."[26] For that reason, Congress created various exceptions to the dischargeability of certain debts.[27] One of those exceptions deals with unpaid taxes.[28] Specifically, Bankruptcy Code § 523(a)(1) excepts the following taxes from discharge: (i) taxes that became due within three years before the petition date; (ii) taxes for which no return was filed or for which the return was filed after the last permitted date; and (iii) taxes for which the debtor made a fraudulent return or that the debtor willfully attempted to evade or defeat.[29]

Here, Lindros timely filed his 2000 tax return; the Government does not contend that return was fraudulent; and the taxes owed on his 2000 tax return became due more than three years before the petition date. Therefore, Lindros is entitled to a discharge from his 2000 delinquent taxes unless he willfully attempted to evade or defeat those taxes.

■ The Government bears the burden of proving by a preponderance of the evidence that Lindros willfully attempted to evade or defeat his 2000 taxes.[30] To satisfy that burden, the Government is required to prove that Lindros (i) engaged in evasive conduct (ii) with a mental state

**23.** Doc. 16, p. 49, l. 6—p. 62, l. 20; Pl. Exs. 12, 13, 14 & 15.

**24.** Doc. 16, p. 63, l. 22—p. 64, l. 18.

**25.** *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 921 (11th Cir.2007); *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1326 (11th Cir.2001).

**26.** *In re Fretz*, 244 F.3d at 1326.

**27.** 11 U.S.C. § 523(a)(1)-(19).

**28.** 11 U.S.C. § 523(a)(1).

**29.** 11 U.S.C. § 523(a)(1)(A)-(C).

**30.** *In re Jacobs*, 490 F.3d at 921; *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1396 (11th Cir.2000).

consistent with willfulness.[31] This case is not an easy one. It ultimately comes down to Lindros' credibility. And the Court finds that Lindros was a credible witness. Accordingly, the Government was unable to establish either prong by a preponderance of the evidence.

### The Government Fails to Establish that Lindros Engaged in Evasive Conduct

■ To satisfy the first prong, the Government must prove that Lindros "engaged in affirmative acts to avoid the payment or collection of taxes."[32] Mere nonpayment of taxes, without more, is not enough.[33] Instead, affirmative acts of culpable omission or acts of commission are required.[34] For instance, the Eleventh Circuit has held in In re Jacobs[35] and In re Griffith[36] that transferring property to family members or significant others for little or no consideration satisfies the first prong. So, too, does using significant income to finance an extravagant lifestyle rather than paying delinquent taxes, like the debtor did in Zimmerman v. IRS.[37]

■ None of those facts are present in this case. Unlike the debtors in Jacobs and Griffith, Lindros in this case did not transfer any property for little or no consideration or otherwise attempt to hide his assets. Nor did Lindros use his income to finance an extravagant lifestyle rather than pay his delinquent taxes. To be sure, Lindros lived an expensive lifestyle between 1999 and 2001: he owned or leased several vehicles, including a Ford Expedi-

tion, a Nissan Xterra, a Porsche, and a Yamaha motorcycle. He also put down a deposit on a Ferrari. In addition, Lindros (i) owned two homes at one time; (ii) spent $2,250 on flying lessons, $3,000 on elective eye surgery, $5,000 on cycling equipment, $2,000 on a kayak, $4,500 on a pool table, and $6,000 on a game room; and (iii) enjoyed several nice vacations.

But those expenses are not extravagant considering Lindros' income at the time and his belief that his stock options were worth millions. Lindros was not living a luxurious lifestyle. In any event, the bulk of those expenses came before he received his 2000 tax assessment. More importantly, there is no evidence that Lindros maintained these expenses after he learned of his 2000 tax delinquency and the value of his stocks collapsed. In fact, he canceled his Ferrari order in early 2001 because he was losing substantial sums in the stock market. He also sold his New Jersey home in late 2001 and sold the Nissan Xterra back to the dealership sometime in 2001. So the facts of this case are distinguishable from Jacobs, Griffith, and Zimmerman, where the debtors' tax liability was determined to be nondischargeable.

The Government does point to other facts it believes satisfy the first prong. For instance, Lindros changed his W–4 withholdings exemptions from six to nine during the 2000 tax year without consulting his accountant. He had previously increased his exemptions from zero to six. According to the IRS, Lindros used that extra money to finance his expensive life-

---

**31.** In re Jacobs, 490 F.3d at 921; In re Fretz, 244 F.3d at 1327.

**32.** In re Jacobs, 490 F.3d at 921.

**33.** In re Haas, 48 F.3d 1153, 1158 (11th Cir. 1995); In re Jacobs, 490 F.3d at 921; In re Fretz, 244 F.3d at 1327.

**34.** In re Fretz, 244 F.3d at 1329.

**35.** In re Jacobs, 490 F.3d at 925–26.

**36.** In re Griffith, 206 F.3d at 1396.

**37.** Zimmerman v. IRS, 262 Fed.Appx. 943, 946 (11th Cir.2008).

style. The IRS also notes that Lindros moved to Belize and failed to file tax returns for the 2004 and 2005 tax years.

Lindros, however, changed his withholdings before learning of his 2000 tax assessment and while his stock was worth millions. And he had a rational explanation for changing his withholdings. According to his testimony, which the Court finds credible, Lindros increased his exemptions because he believed he had increased itemized deductions. At the time, he had two houses he was paying for, and he was deducting the mortgage interest and property taxes. Besides, there was no evidence what impact that had on his 2000 tax liability. Moreover, the Court also finds credible Lindros' testimony that he did not move to Belize to avoid paying his delinquent taxes. After all, he only moved there after opening a dialogue with the IRS, and there was evidence that his move to Belize would reduce his post–2000 tax liability. Finally, while Lindros did not file 2004 and 2005 tax returns when he moved to Belize, he did file the returns—albeit belatedly—when he returned in to the United States in 2007. Accordingly, those facts do not satisfy the Government's burden under the first prong.

### The Government Failed to Establish that Lindros Acted Willfully

Even if the Government had satisfied the first prong, it failed to satisfy the second prong. To satisfy that prong, the Government must show that Lindros "voluntarily, consciously or knowingly, and intentionally" attempted to evade his tax liability.[38] The Debtor's conduct is "willful" under that standard if he (i) had a duty under the law; (ii) knew he had that duty; and (iii) voluntarily and intentionally violated that duty.[39] The Debtor does not dispute that he had a duty to pay taxes or that he knew of that duty. The sole issue with respect to the second prong, therefore, is whether he voluntarily and intentionally violated that duty.

The Court finds that the Government fails to establish that the Debtor voluntarily and intentionally violated his duty—principally for four reasons. First, the Court finds credible Lindros' testimony that he would be able to offset his 2000 tax liability with capital losses from later years and that he increased his W–4 exemptions because of increased itemized deductions. In particular, the Court notes that Lindros—unlike the debtors in *Griffith*—did not attempt to evade the questions on cross-examination and appeared to testify truthfully. Second, he did not continue maintaining his expensive lifestyle after he learned that he was unable to offset his 2000 tax liability with his capital losses from later years. Third, he initiated contact with the IRS in 2002 and attempted to work with the IRS to resolve his tax delinquency. Fourth, Lindros believed his 2000 tax delinquency was discharged in 2004. Based on those facts, the Court concludes the Government failed to prove that Lindros voluntarily and intentionally violated his duty to pay his 2000 taxes.

### Conclusion

For the reasons set forth above, the Court concludes that the Government failed to establish that Lindros willfully evaded the payment or collection of his taxes. Accordingly, the Court will enter final judgment in favor of Lindros on Count I of his adversary complaint.

**38.** *In re Jacobs*, 490 F.3d at 921; *In re Fretz*, 244 F.3d at 1330.

**39.** *In re Jacobs*, 490 F.3d at 921; *In re Fretz*, 244 F.3d at 1330.