In re Arthur M. VOLPE, Debtor.

Arthur M. Volpe, Plaintiff,

v.

Internal Revenue Service, Defendant.

Bankruptcy No. 03–15888.
Adversary No. 06–2038.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Oct. 23, 2007.

Thomas C. Pavlik, Novak, Robenalt & Pavlik LLP, Cleveland, OH, for Plaintiff.

Alex T. Case, Washington, DC, for Defendant.

### MEMORANDUM OF OPINION

PAT E. MORGENSTERN–CLARREN, Bankruptcy Judge.

Debtor Arthur M. Volpe filed this adversary proceeding against the Internal Revenue Service seeking a declaratory judgment that his federal tax debts for the years 1997, 1998, and 1999 are dischargeable in his chapter 7 case.[1] The IRS responded that the debtor's liabilities for those years are excepted from discharge under 11 U.S.C. § 523(a)(1)(C) because the debtor willfully attempted to evade paying the taxes. For the reasons stated below, the court finds that the debts are not discharged.

### JURISDICTION

Jurisdiction exists under 28 U.S.C. § 1334 and General Order No. 84 entered by the United States District Court for the Northern District of Ohio. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### FACTS

#### I.

The court held a trial on this complaint on September 20, 2007. The debtor presented his case through his own testimony and with documents. The IRS presented its case through the cross-examination of the debtor, the examination of Audrey Volpe (the debtor's mother) as if on cross, the direct examination of Diane Podway (the debtor's former girlfriend), and with documents.

These findings of fact are based on the parties* joint stipulations of facts[2] and the evidence presented at trial. The findings reflect the court's weighing of the evidence presented, including determining the credibility of the witnesses. "In doing so, the Court considered the witnesses* demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language or nuance of expression." *In re V Companies*, 274 B.R. 721, 726 (Bankr.N.D.Ohio 2002). *See* FED. R. BANKR.P. 7052 (incorporating FED.R.CIV.P. 52). When the court finds that a witness's explanation was satisfactory or unsatisfactory, it is using this definition:

> The word satisfactory may mean reasonable, or it may mean that the Court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the [witness] say[s] with reference to the [issue at hand]. He is satisfied. He no longer wonders. He is contented.

*United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 659 (Bankr.N.D.Ohio 1990) (internal citations and quotation marks omitted).

#### II.

The debtor is a self-employed real estate

---

1. The debtor's bankruptcy case was filed before October 17, 2005, the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23. All citations are, therefore, to the bankruptcy code as it existed before that date.

2. Docket 34.

agent and licensed realtor[3] who has been in the business for 33 years. When he filed his chapter 7 petition, he had federal income tax liabilities in the amount of $203,257.25 for the tax years 1997, 1998, 1999, and 2002.[4] The debtor received his bankruptcy discharge on August 19, 2003. *See* 11 U.S.C. § 727. This litigation was triggered post-discharge when the IRS sent a letter to the debtor stating that his tax debt was non-dischargeable under § 523(a)(1)(C).[5] The debtor then filed this adversary proceedings asking that the debt for 1997, 1998, and 1999 be declared dischargeable.

### The Debtor's Tax Assessment and Payment History

*Tax year 1997:* The debtor received extensions to file his tax return until October 15, 1998, but did not file his return until April 5, 1999. The debtor reported $225,475.00 in gross income, of which $64,981.54 was due in taxes. The debtor made one $12,000.00 payment on April 15, 1998. On April 7, 1999, the debtor made a $16,000.00 payment toward his 1998 tax liability, which the IRS applied to his outstanding taxes for 1997. On January 28, 2002, the IRS sold the debtor's rental property at 87 Lincoln Avenue, Berea, Ohio pursuant to a levy, and applied the proceeds totaling $45,729.80 to the 1997 tax debt. The underlying tax liability for 1997 is now paid, but accrued penalties and interest to the petition date remain in the amounts of $15,851.08 and $22,165.22, respectively.[6]

*Tax year 1998:* The debtor received extensions to file his tax return until October 15, 1999, but did not file his return until April 18, 2000. He reported $174,161.00 in gross income, of which $64,414.00 was due in taxes. The debtor has not made any payments on this liability. To date, the underlying tax liability remains $64,414.00 and the penalties and interest to the petition date are $33,520.65 and $28,448.65, respectively.[7]

*Tax year 1999:* The debtor timely filed his tax return on April 15, 2000. He reported $115,736.00 in gross income, of which $32,862.00 was due in taxes. The debtor did not make any voluntary payments toward this liability, but the IRS applied two overpayments from tax year 2000 totaling $9,994.00 to the 1999 debt. To date, the underlying tax liability is $22,868.00, and the penalties and interest to the petition date are $6,814.37 and $6,753.12, respectively.[8]

### The Debtor's Divorce

The debtor testified that he did not have any money to pay his tax obligations in 1997, 1998, and 1999 because he was caught up in a long and complex divorce. The divorce proceedings officially began in August 1997,[9] but the Volpes' marital problems existed at least since 1995 or 1996, when the debtor moved out of their shared residence at 19471 Stoughton Drive, Stongsville, Ohio to a rental property he owned with his then-wife at 172 Fair Street, Berea, Ohio.[10] The debtor testified that he could not pay his taxes because all of his money was "tied up in the divorce," and that he had to pay attorney fees of about $50,000.00 to his own attorney and $37,500.00 to his ex-wife's attorneys, plus

---

3.  Stip. ¶ 9.

4.  Stip. ¶ 3.

5.  Complaint ¶ 6. (Docket 1).

6.  Stip. ¶¶ 4, 9; Jt. Exhs. 1, 4.

7.  Stip. ¶¶ 5, 9; Jt. Exhs. 2, 5.

8.  Stip. ¶¶ 6, 9; Jt. Exhs. 3, 6.

9.  Jt. Exh. 13.

10.  Stip. ¶¶ 10, 11.

additional fees after the divorce was granted. The Volpes signed a separation agreement on September 9, 1998 and the court entered an agreed judgment entry of divorce in April 1999, but the divorce proceedings continued until 2006.[11] The debtor testified that the divorce was acrimonious.

### The Crossbrook Property

The crux of the factual dispute in this case is a house located at 548 Crossbrook Drive, Berea, Ohio that was owned by Janice Justice, a family friend. In about September 1998, Ms. Justice contacted the debtor to discuss listing the house with him for sale. The debtor testified that he encouraged his mother, Audrey Volpe, to buy it so that she could have an investment and also so that he could move there with his children from the Fair Street property.

The debtor handled all aspects of the transaction with Ms. Justice, including negotiating a purchase price of $145,000.00 secured by a mortgage, with no money down and no closing costs, to be paid in equal installments over thirty years at 7% interest, which amounted to a monthly payment of $941.00. Audrey Volpe and Ms. Justice signed the warranty deed on September 28, 1998 and recorded it on October 1, 1998.[12] The debtor testified that he immediately agreed to rent the property from his mother, paying rent in the same amount as the monthly payments due to Ms. Justice. There was no written rental agreement.[13] The debtor made each month's payment directly to Ms. Justice.[14] The debtor also paid the utility bills, the real estate taxes, the insurance payments, and any maintenance costs himself.[15] Audrey Volpe did not keep any of the paperwork associated with the transaction, nor did she report the rent payments on her income taxes or take a mortgage interest deduction for the property on her tax returns.[16]

The debtor testified that he arranged this transaction because (1) he did not have the money to buy the property himself; and (2) he could not buy it directly for fear that his wife would try to acquire it in the divorce. By the time the Crossbrook paperwork was signed and filed, however, the debtor's then-wife had already signed the separation agreement in which she agreed to "transfer all her right, title and interest to the real estate located at ... 548 Crossbrook Drive, Berea, Ohio, to Husband." [17] The debtor testified that he could not take her word at face value and, therefore, asked his mother to buy the house. When asked to explain why he thought it necessary to refer in the separation agreement to property owned by his mother, he said that his attorney inserted this provision either through inadvertence or an overabundance of caution during the settlement negotiations.

In July 2003, after the debtor had filed his bankruptcy case, he renegotiated the terms of the loan with Ms. Justice. They agreed to drop the interest rate from 7% to 5% and reduce the term of the note from thirty years to fifteen years.[18] These changes meant that the debtor's monthly payments increased to $1,486.00. The

11. Stip. ¶ 27; Jt. Exhs. 7, 13.

12. Jt. Exh. 8.

13. Stip. ¶ 19.

14. Stip. ¶¶ 14, 16, 18.

15. Stip. ¶ 17.

16. Stip. ¶¶ 16, 18.

17. Jt. Exh. 7.

18. Stip. ¶ 20; Jt. Exh. 10.

debtor continued to make all payments directly to Ms. Justice.

On June 10, 2005, the chapter 7 trustee filed an adversary proceeding in which the trustee alleged, among other things, that the debtor had an ownership interest in the Crossbrook property that was part of the bankruptcy estate. On January 13, 2006, the court entered an order granting the trustee's motion to compromise that dispute with the debtor; he paid $7,000.00 to the estate without an admission of liability and the court closed the adversary proceeding.[19]

The debtor then asked his bankruptcy counsel if it was "ok" to put the property in his name since the bankruptcy had closed.[20] Counsel advised him that it was. About one week later, on January 24, 2006, Audrey Volpe conveyed the Crossbrook property to the debtor for no consideration by quitclaim deed.[21] The debtor then executed a mortgage deed with Ms. Justice.[22] The debtor and Audrey Volpe both testified that they made this transfer because of Audrey Volpe's ill health, with the thought that when she died, the debtor would keep the house without the property going through the probate court. The debtor has siblings and there was no explanation for why his mother wanted to transfer the house to him alone.

### Money Spent by the Debtor on Vacations and Private Schools

Throughout the divorce proceedings and following the entry of divorce, the debtor had primary custody of the Volpes' two children and paid for their education. Between 1997 and 1999, both children attended private school at a cost of approximately $6,300.00 per year. Between 1999 and 2003, the debtor's son attended a private high school at a cost of about $8,900.00 per year, and since 2004 the debtor's daughter has attended a private high school at a cost of about $6,700.00 per year. In addition, the debtor has paid for his son's undergraduate education at a cost of $26,560.00 per year.[23] The April 1999 divorce decree required him to pay for his children to attend private school through high school.[24] The debtor testified, however, that he would have made these payments even without the court order.

There was also trial testimony concerning the debtor's vacations. Between 1996 and 2000, the debtor took at least three vacations with his then-girlfriend Diane Podway.[25] In December 1999, the debtor took a ten-day trip with Ms. Podway to Hawaii at a total cost of about $5,000.00, of which Ms. Podway testified she paid between $800.00 and $1,000.00. The debtor also took trips with her to the Bahamas and Florida sometime during this period. Ms. Podway testified that she did not contribute to the cost of these trips.

### THE POSITIONS OF THE PARTIES

The IRS asserts that the debtor willfully attempted to evade or defeat his tax obligations for 1997, 1998, and 1999 by concealing his ownership of the Crossbrook property and choosing to spend his money on luxuries rather than on his taxes. As a result, the IRS argues, his tax debt for

19. Adversary proceeding 05–1290, docket entry for 1/13/06.

20. As a point of clarification, the bankruptcy case was still open, but the adversary proceeding was closed.

21. Stip. ¶ 21; Jt. Exh. 11.

22. Stip. ¶ 22; Jt.Exh. 12.

23. Stip. ¶ 25.

24. Jt. Exh. 7.

25. Stip. ¶ 23.

those years is non-dischargeable under § 523(a)(1)(C). The debtor's position is that his failure to pay taxes was not a willful attempt to evade or defeat his tax obligation, but rather the inevitable consequence of the length, complexity, and difficulty of his divorce.

## *DISCUSSION*

### 11 U.S.C. § 523(a)(1)(C)

■■■ An individual chapter 7 debtor is generally entitled to a discharge of all debts that arose before the filing of the bankruptcy petition. *See* 11 U.S.C. § 727(b). This general rule, however, is subject to the exceptions set forth in bankruptcy code § 523. The IRS relies on the exception found in § 523(a)(1)(C), which states:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> (1) for a tax ...
>
>        * * *
>
> (C) with respect to which the debtor ... willfully attempted in any manner to evade or defeat such tax[.]

11 U.S.C. § 523(a)(1)(C). This exception limits the discharge of tax debts to the honest, but unfortunate debtor. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). As with all exceptions to discharge, the IRS must prove that the exception applies by a preponderance of the evidence. *See id.* at 287–88, 111 S.Ct. 654; *Stamper v. United States (In re Gardner)*, 360 F.3d 551, 557 (6th Cir.2004).

■■■ The inquiry into whether the debtor "willfully attempted in any manner to evade or defeat" the tax liability is divided into two elements: a conduct element and a mental state requirement. *In re Gardner*, 360 F.3d at 558. When determining whether the conduct element or mental state requirement has been satisfied, the totality of the debtor's conduct is considered. *See, e.g., Dalton v. Internal Revenue Serv. (In re Dalton)*, 77 F.3d 1297, 1301 (10th Cir.1996); *Myers v. Internal Revenue Serv. (In re Myers)*, 216 B.R. 402, 405 (6th Cir. BAP 1998), *aff'd*, 196 F.3d 622 (6th Cir.1999); *Harris v. United States (In re Harris)*, 328 B.R. 837, 843 (Bankr.S.D.Ala.2005); *May v. United States Internal Revenue Serv. (In re May)*, 247 B.R. 786, 793 (Bankr.W.D.Mo. 2000), *aff'd*, 251 B.R. 714 (8th Cir. BAP 2000), *aff'd*, 2 Fed.Appx. 681 (8th Cir. 2001).

■■■ To satisfy the conduct element, the IRS must prove that the debtor avoided or evaded the payment or collection of taxes through either acts of omission, such as failure to file returns and failure to pay taxes, or affirmative acts of evasion, such as placing assets in the name of others. *See In re Gardner*, 360 F.3d at 557–58; *Toti v. United States (In re Toti)*, 24 F.3d 806, 809 (6th Cir.1994); *In re Myers*, 216 B.R. at 404–05. The debtor's failure to pay taxes is not in and of itself sufficient to satisfy the IRS's burden of proof, but it is a relevant consideration. *In re Myers*, 216 B.R. at 405. When nonpayment of taxes is combined with a pattern of failing to file returns or where the debtor otherwise attempts to conceal assets from the IRS, the totality of those circumstances can support a finding that the debtor is not entitled to a discharge. *See In re Birkenstock*, 87 F.3d 947, 951–52 (7th Cir.1996).

■■■ As for the mental state requirement, the IRS must show that the debtor's attempt to avoid his tax liability was willful. Because there is rarely direct proof of a debtor's intent, intent may be proven by circumstantial evidence. *See, e.g., In re Dalton*, 77 F.3d at 1303–04; *In re May*,

247 B.R. at 793; *Teeslink v. United States (In re Teeslink)*, 165 B.R. 708, 716 (Bankr. S.D.Ga.1994). For purposes of § 523(a)(1)(C), the Sixth Circuit "equates 'willful' with voluntary, conscious, and intentional...." *In re Toti,* 24 F.3d at 809. Thus, "[t]he mental state requirement is proven when the debtor: '(1) had a duty to pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty[.]' " *In re Gardner,* 360 F.3d at 558 (quoting *United States v. Fretz (In re Fretz),* 244 F.3d 1323, 1330 (11th Cir. 2001)). "This willfulness requirement prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate." *In re Birkenstock,* 87 F.3d at 952.

### The Conduct Element

The IRS proved the conduct element based on the debtor's acts of filing his tax returns late, failing to pay the taxes even though he had enough money to pay for non-necessities such as vacations and private school, and concealing his interest in the Crossbrook property. The evidence clearly showed that the debtor repeatedly failed to timely file his income tax returns and repeatedly failed to pay the taxes assessed. While the debtor did file his 1999 tax return on time and eventually filed his 1997 and 1998 tax returns, a debtor's belated and partial compliance with the law does not nullify his initial failures to file returns and pay the liability. *See, e.g., In re Myers,* 216 B.R. at 405; *Hassan v. United States (In re Hassan),* 301 B.R. 614, 623 (S.D.Fla.2003).

In addition to omitting to file his returns and pay his taxes, the debtor also affirmatively evaded paying taxes by the manner in which he structured the Crossbrook property transaction. The overwhelming weight of the evidence showed that the transaction between Audrey Volpe and Janice Justice was a sham, and that the debtor had an ownership interest in the property.

There was no credible evidence that Audrey Volpe intended to participate in this deal as an investor. If this had truly been an investment, one would expect the facts to show such things as, for example, disposable income to invest in real estate, the ability to afford the monthly payments including the taxes, management of the investment, income received from the investment and reported to the IRS, and the election to take advantage of tax laws permitting deductions relating to such an investment. The evidence did not show any of that. Audrey Volpe, age 79 at the time of the trial, is a retired hairdresser who lives on a pension and social security and who admitted that she did not have the money to make the monthly payments if she had been required to do so. She did not keep any of the paperwork relating to the transaction, never reported the debtor's rent payments as income, and never took a mortgage interest deduction on her tax returns. Eventually, she transferred the property to the debtor for no consideration. These are not the acts of someone purchasing a house as an investment property. Audrey Volpe may well have had a sincere desire to help her son and grandchildren live in the Crossbrook house, but that does not establish that she was the purchaser in this transaction.

The debtor's conduct, on the other hand, is totally consistent with that of someone with an ownership interest in the property. He found the house and negotiated the purchase with the intent to live there with his children. He paid the utility bills, the real estate taxes, the insurance payments, and the maintenance costs. His rent equaled the monthly payments owed under

Audrey Volpe's note and he paid the money each month directly to Ms. Justice. Tellingly, he negotiated a refinancing that increased the monthly note payments by about $500.00, and then increased his "rent" payments to Ms. Justice by this same amount. Renters do not generally negotiate to raise their rent, which is against their economic interest. Owners, however, often renegotiate deals to lower the interest rate on their obligations. The court finds based on all of the circumstances that the debtor, and not his mother, owned this property.

By putting title to this asset in Audrey Volpe's name, the debtor prevented the IRS from placing a tax levy on the property and selling it to satisfy some of the debtor's tax debt. This is an affirmative act of evasion. See In re Gardner, 360 F.3d at 559; In re Zuhone, 88 F.3d 469, 471 (7th Cir.1996). The debtor argued that this situation should be disregarded because there was no equity in the property. First, there was no evidence to support that statement And second, the existence of equity is irrelevant to whether the debtor titled the property in his mother's name to conceal his interest in it. See United States v. Jacobs (In re Jacobs), 490 F.3d 913, 925 n. 13 (11th Cir.2007). The debtor's additional acts of filing tax returns late prevented the IRS from assessing the debtor's tax liability and thereby frustrated the collection of taxes. See In re Fretz, 244 F.3d at 1330. Taken as a whole, therefore, the court finds that these acts and omissions satisfy the conduct element of § 523(a)(1)(C). See In re Gardner, 360 F.3d at 559–60; In re Myers, 216 B.R. at 405.

### The Mental State Requirement

■ The debtor's primary contention is that the IRS did not prove that he *willful-ly* attempted to evade or defeat his tax liability. He contends that his divorce was the sole cause of his failure to pay taxes in 1997, 1998, and 1999. As proof, the debtor relies on the fact that the years in which he foiled to pay his taxes were the same as those in which his divorce was pending. Notwithstanding the general mental and financial stress that accompanies many divorces, the IRS presented ample credible evidence in this case to satisfy the mental state requirement.

■ The IRS is not required to show that the debtor engaged in a fraudulent scheme to prove that he acted willfully. *In re Jacobs*, 490 F.3d at 925. Rather, the Sixth Circuit has defined "willfully" in this context to mean "voluntarily, consciously, and intentionally." *In re Toti*, 24 F.3d at 809. This translates into a requirement that the IRS must prove that the debtor (1) had a duty to pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty. *In re Gardner*, 360 F.3d at 558. The debtor stipulated to the first two elements,[26] leaving only the question of whether he voluntarily and intentionally violated his duty.

■ As discussed above, the IRS proved that the debtor concealed a real estate asset. Evidence that a debtor held property in another's name is relevant not only to the conduct element but also to the willfulness element. *See In re Zuhone*, 88 F.3d at 471; *Dalton*, 77 F.3d at 1302; *In re Hassan*, 301 B.R. at 624; *see also In re Gardner*, 360 F.3d at 557 (concerning concealed nominee accounts); *In re Birkenstock*, 87 F.3d at 952 (involving property held in trust). In an attempt to blunt the impact of the property ownership evidence, the debtor testified that his only motivation for structuring the transaction as he did was to try to keep the asset away from

26. Stip. ¶¶ 7, 8.

his wife. The court does not believe that this is the whole explanation. The debtor and his then-wife had already signed the separation agreement in which the wife disclaimed any interest in the Crossbrook property before the debtor had his mother enter into the deal with Ms. Justice.[27] The debtor did not offer any satisfactory explanation for why he feared his ex-wife could affect the transaction after that. It is, instead, far more likely that the debtor decided to put the deed in his mother's name so that he could insulate the property from an IRS levy based on his tax liability.

The IRS also proved that, at a time when the debtor admitted he had a duty to pay his tax debt, he used his money to go on vacation and pay for private school for his children. The evidence showed that the debtor spent at least $4,000.00 on a trip to Hawaii in 1999,[28] and more than $12,000.00 per year between 1997 and 1999 to send his children to private school. The debtor did not attempt to justify his vacation expenses, but merely argued, without legal citation, that taking trips during this period did not constitute a willful attempt to evade or defeat his taxes.[29] To the contrary, when the debtor used his disposable income for leisure activities, knowing that he had a significant tax liability, the debtor made a voluntary decision to spend the money on himself rather than to pay his taxes. As for the private school tuition, the debtor argued that these were not voluntary payments because the separation agreement and divorce decree required him to pay educational expenses.

The debtor, however, paid these expenses for some years before he was legally obligated to do so. He then agreed to a legal commitment to continue to pay the tuition through high school in the separation agreement. There was no evidence that either child had any particular need that could not be satisfied through public education and the debtor testified that he would have paid these expenses regardless of the court order. All of this shows that the debtor undertook the tuition expenses voluntarily.[30]

The evidence showed that the debtor certainly had some money that he could have put toward his tax debt even while he was going through the divorce proceedings. The debtor's decision to spend his money on vacations and private school tuition weighs in favor of a finding that he willfully evaded his tax liability. *See In re Gardner,* 360 F.3d at 560–61; *In re Harris,* 328 B.R. at 843–5.

Finally, with respect to the debtor's intent, the court does not believe the debtor's explanation for his actions. He argued that all of his money was "tied up" in the divorce and that the divorce was extremely stressful, thus showing that he could not have made the tax payments. Divorce can certainly be difficult on multiple levels. While the domestic relations case may have caused the debtor distress, it did not affect his ability to earn well over $100,000.00 per year (and sometimes over $200,000.00 per year). *Cf. In re Fretz,* 244 F.3d at 1331; *In re Harris,* 328 B.R. at 840, 843. Moreover, in the years

---

27. Stip. ¶ 27; Jt. Exhs. 7, 8.

28. The debtor made other trips during the relevant time period, which the court considers in the totality of the debtor's conduct, but the evidence presented did not show exactly when these trips took place or how much the debtor spent on them.

29. Debtor's trial brief at unnumbered page 8.

30. The debtor admits that he should have taken the money he paid for his son's college education and used it to pay his taxes. These expenditures, however, occurred after the debtor filed for bankruptcy. *See* Stip. ¶ 25.

590

following his divorce and before his bankruptcy, the debtor continued to earn a significant income,[31] still without repaying his tax debt. Additionally, the debtor did not offer any documents to support his conclusory statement that all of his money was "tied up" in the divorce. Simply put, this is not a case where the debtor made an inadvertent mistake in not paying his taxes. Rather, this is a case where a business savvy debtor who knew that he had an obligation to pay taxes, chose instead to ignore this duty and spend his money elsewhere, concealing a valuable real estate asset in the process. The court finds, therefore, that the debtor's failure to pay taxes for the years 1997, 1998, and 1999 was both voluntary and intentional. Consequently, the IRS satisfied its burden of proving the mental state requirement of § 523(a)(1)(C).

With both the conduct element and the mental state requirement met, the court concludes that the debtor willfully attempted to evade or defeat his tax obligations for the years 1997, 1998, and 1999, and that his tax debt for those years is non-dischargeable. *See* 11 U.S.C. § 523(a)(1)(C).

### CONCLUSION

For the reasons stated, judgment will be entered in favor of the IRS. A separate order will· be issued reflecting this decision.

### JUDGMENT

For the reasons stated in the memorandum of opinion entered this same date, judgment on the complaint is entered in favor of the Internal Revenue Service. The tax debt for the years 1997, 1998, and 1998 owed by the plaintiff-debtor Arthur

Volpe is determined to be non-dischargeable under 11 U.S.C. § 523(a)(1)(C).

IT IS SO ORDERED.

---

**31.** The debtor earned $182,913.00 in 2000, $168,868.00 in 2001; $282,990.00 in 2002 and $226,756.00 in 2003. Stip. ¶ 9; Gov't Exhs. A–D.