**In re Leo Jimmy KIGHT, and Karen Teresa Sullivan–Kight, Debtors.**

**Leo Jimmy Kight, and Karen Teresa Sullivan–Kight, Plaintiffs,**

**v.**

**Department of Treasury/Internal Revenue Service, Defendant.**

**Bankruptcy No. 3:07–bk–03025–JAF.
Adversary No. 3:10–ap–326.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Sept. 20, 2011.

Brian R. Harris, U.S. Department of Justice, Tax Division, Stephen C. Dowdell, United States Department of Justice, Washington, DC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This proceeding came before the Court upon a complaint seeking damages for a violation of the discharge injunction. The Court conducted a trial of the proceeding on February 14, 2011 and February 15, 2011. In lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions. Upon the evidence and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Plaintiffs are both attorneys who graduated from Mercer University Law School in 1988. (Tr. at 27, 98.) While in law school, Plaintiffs took a federal tax class, which focused mainly on personal income tax. (Tr. at 27, 98.) Plaintiffs both knew they had an obligation to file tax returns every year and, with the exception of one year prior to 2000, Plaintiffs timely filed their tax returns. (Tr. at 32, 33, 102.)

Beginning in 1995 Plaintiffs practiced law with Mrs. Kight's brother in Forsyth, Georgia. (Tr. at 31.) Each of the three members of the firm had a capital account. (Tr. at 38.) One third of the firm's overhead expenses was to be subtracted from whatever each member brought in, leaving each member with the difference. (Id.) In 1997 Mr. Kight began work on the Ebon Academy cases[1], a series of large and complicated multi-party and multi-forum lawsuits arising out of the operation and sudden closure of a private K–12th grade boarding school in Forsyth, Georgia. (Tr. at 36–37; Def.'s Ex. 3, Resp. # 14.) The Ebon cases eventually became the only cases upon which Mr. Kight was working. (Tr. at 37.) Because Mr. Kight was han-

---

1. (*Ebon Foundation v. Oatman,* 269 Ga. 340, 498 S.E.2d 728 (1998)).

dling the Ebon cases on a contingency basis, he had virtually no income. (Tr. at 38.) What little income Mrs. Kight brought in went toward her portion of the office overhead. (Def.'s Ex. 3, Resp. # 14.) In order to provide Plaintiffs with income, which they took in the form of partnership draws, Mrs. Kight's brother loaned money to the firm. (Tr. at 38–39.) The source of the funds was an equity line on his home. (Id.)

By July 1999 Plaintiffs' situation had become "untenable". (Tr. at 39.) Mrs. Kight's brother's home equity loan was near capacity. (Tr. at 39.) Mr. Kight's father urged Plaintiffs to move to St. Augustine. (Id.) Mr. Kight's father offered to co-sign on a loan to enable Plaintiffs to move to St. Augustine and to enable Mr. Kight to take the Florida Bar and establish a law practice. (Id. at 39–40.)

In July 1999 Plaintiffs moved to St. Augustine. (Tr. at 39.) Plaintiffs rented a house (the "Gerona Road Property") with an option to buy. (Tr. at 40.) Mr. Kight continued litigating the Ebon cases. (Tr. at 41.) Mr. Kight also took and passed the Florida Bar examination and in November 1999 began the background investigation process for admission to the Florida Bar. (Tr. at 42.) Mrs. Kight took a job as a server and bartender at a local Irish pub. (Tr. at 113.)

In late 1999 the Ebon cases settled. (Tr. at 42.) On February 29, 2000, Mr. Kight received a settlement of $1.2 million on behalf of his clients. (Tr. at 43.) Of that, the law firm received a contingency fee of $425,000.00. (Tr. at 44.) After paying his brother in law for his work on the Ebon cases and replenishing Plaintiffs' capital accounts, Mr. Kight received $316,833.00. (Tr. at 46.)

During the spring of 2000 Plaintiffs made the following expenditures. (Tr. at 50.) Plaintiffs paid off two lines of credit upon which Mr. Kight's father had co-signed which totaled approximately $65,000.00 (Tr. at 47–48.) Plaintiffs spent $4,700.00 on furniture. (Tr. at 48.) Plaintiffs spent $35,346.00 to pay off their past due 1996, 1997, and 1998 federal income taxes. (Tr. at 48.) Plaintiffs used approximately $4,500.00 to pay past due Georgia state income taxes. (Tr. at 48.) Plaintiffs paid $4,388.00 to their former law firm for a malpractice insurance premium and for an employee's retirement account. (Tr. at 48.) Plaintiff's paid their 2000 property taxes in the amount of $2,165.00. (Tr. at 49.) Plaintiffs paid $7,000.00 to bring their student loans current. (Tr. at 55.) Plaintiffs spent $5,000.00 on a second vehicle. (Tr. at 58.)

In April 2000 Plaintiffs invested $100,000.00 in a Raymond James mutual fund account. (Tr. at 61.) Plaintiffs hoped the money would grow enough to cover the entire tax liability, which Mr. Kight believed would be approximately $150,000.00. (Tr. at 55, 57–58.)

On June 29, 2000 Plaintiffs purchased the Gerona Road Property for $136,000.00. (Tr. at 142.) Plaintiffs spent $6,551.00 on closing costs. (Tr. at 48.) Plaintiffs made a $10,000.00 down payment and financed the remaining $126,000.00 with a balloon note. (Tr. at 142; Def.'s Ex. 15.) Mr. Kight's father was a co-signor on the note. (Tr. at 141; Def.'s Ex. 15.)

Plaintiffs kept $90,000.00 to $95,000.00 of the proceeds in a money market account to be used for living expenses. (Tr. at 49.) Aside from Mrs. Kight's income from her job as a server and bartender at the Irish pub and Plaintiffs' later attempts to operate the pub, Plaintiffs had no income from March 2000 until September 2001.(Id.) During that time Plaintiffs' living expenses totaled approximately $5,000.00 monthly. A portion of the living expenses was com-

prised of Catholic school tuition for Plaintiffs' children.[2] Plaintiffs are the parents of a son with Asperger's Syndrome, a high functioning form of autism. (Tr. at 124.) Plaintiffs were advised by therapists, psychologists and psychiatrists that it was necessary for the child to attend private school. (Tr. at 125–127.) Additionally, Plaintiffs' son's medical expenses were not covered by insurance. From February 2000 until October 2001 Plaintiffs spent $13,000.00 on their son's out of pocket medical expenses. (Tr. at 127.)

On April 15, 2001 Plaintiffs filed an extension of time to file their 2000 tax return, extending the deadline to file their return until October 15, 2001. (Def.'s Ex. 7; Tr. at 69.) Plaintiffs calculated they would have a tax liability of $123,488.00. (Id. at 70.) Although Plaintiffs had money in the Raymond James account and in their checking account, they paid only $1,000.00 with the extension. (Id.)

Because of his tax and credit issues, Mr. Kight encountered difficulty obtaining admission to the Florida Bar. (Def.'s Ex. 3, Resp. # 14.) Having become frustrated with the process, during the spring of 2001 Mr. Kight abandoned his bar admission plans and began to look for another means to earn a living. (Id.; Tr. at 72.) Around that same time, the family, which operated the Irish pub at which Mrs. Kight had been working, approached Plaintiffs about purchasing the pub. During May of 2001 Plaintiffs purchased the pub. (Tr. at 71–72.) Plaintiffs took out a $40,000.00 margin loan on their Raymond James investment account to make the down payment on the purchase. (Tr. at 74.) Plaintiffs also paid $5,000.00 to one of the pub's partners for back wages he was owed from

2000. (Tr. at 76.) The investment failed and Plaintiffs lost the $40,000.00. (Id.)

Although at some point the value of the Raymond James account was $110,000.00 or $120,000.00, after September 11, 2001 the stock market began to plunge. (Tr. at 77.) In October or November 2001 Plaintiffs liquidated the account. (Tr. at 78.) After payment of the margin loan, Plaintiffs received $51,782.00. (Id.) On November 15, 2001 Plaintiffs filed their 2000 income tax return reporting taxable income of $327,606.00, a total tax liability of $124,488.00, and an outstanding tax liability of $123,488.00. (Def.'s Ex. 10.) Despite having recently received the $51,782.00 from the Raymond James account, Plaintiffs did not pay anything with their tax return. (Tr. at 78.) Mr. Kight testified that they did not send any portion of the money to the IRS because "once again we were faced with we had no income, no job, no Bar license, no pub to run, nothing, and this was the only money we had … the memories we had of the way [of] life with no money were never far from mind." (Tr. at 78–79.) Mrs. Kight testified that it had become clear to Plaintiffs that if they used the proceeds from the Raymond James account to pay the Internal Revenue Service (the "IRS"), they would not have enough money to maintain a home, to feed their family and to pay for their autistic son's uninsured medical expenses and necessary private school. (Tr. at 119–120.)

During 2002 Mr. Kight became involved in another large multi-party and multi-forum contingency fee case involving South Georgia real estate fraud (the "Waycross Property Case"). (Tr. at 81; Def.'s Ex. 3, Resp. # 14.) Although Mr. Kight was successful in obtaining default judgments against the defendants, the defendants had

---

**2.** Mr. Kight testified that the tuition totaled approximately $7,000.00 per year for two children. (Tr. at 56.)

no assets to satisfy the judgments. (Id.) Mr. Kight made no money on the Waycross Property Case. (Id.)

In an effort to help fund the Waycross Property Case, Mr. Kight's parents co-signed on another line of credit. (Tr. at 81.) By early 2003 Plaintiffs had drawn $40,000.00 on the line of credit. (Id.) Plaintiffs were also behind on their mortgage. (Id.) The bank, which held the note on the Gerona Road Property, was threatening to foreclose if Plaintiffs did not transfer the property to Mr. Kight's parents. (Tr. at 82.) On March 14, 2003 Plaintiffs transferred the Gerona Road Property to Mr. Kight's parents. (Tr. at 82; Def.'s Ex. 16.) Mr. Kight testified that Plaintiffs "just went to the bank and signed what [the president of the bank] told me to sign. [Mr. Kight's parents] paid off the notes and they paid off the mortgage on the house, about $160,000." (Tr. at 82.) Mrs. Kight testified that "my father-in-law, in order to save the house and his own money and his own investment and to help keep a roof over our heads, I guess, I don't know, he took it back because we couldn't afford it. It's as simple as that. He took it because we couldn't pay for it and they were going to foreclose on the home." (Tr. at 143.) Mrs. Kight testified that the Gerona Road Property was worth approximately $140,000.00 to $145,000.00 at that time. (Tr. at 144.) To the extent there was equity in the house, Mr. Kight's parents received that equity. (Tr. at 83.)[3] On April 9, 2003 Mr. Kight's parents paid off the mortgage on the Gerona Road Property. (Def.'s Ex. 17.) Mr. Kight's parents also paid off the $40,000.00 line of credit. (Tr. at 82.)

During 2003 and 2004 Mr. Kight worked as an office manager by day earning approximately $10.00 an hour and a hotel auditor and karaoke show host by night. (Def.'s Ex. 3, Resp. # 1.) In 2005 Mr. Kight took a job as an assistant public defender in the State of Georgia public defender system. (Tr. at 154.) Mr. Kight commutes 670 miles weekly, driving from St. Augustine to Forsyth, Georgia on Sunday and returning to St. Augustine on Friday. (Tr. at 154–155.) Mr. Kight's annual salary was $52,000.00 in 2005, $55,000.00 in 2006, and $57,000.00 in 2007. (Def.'s Ex. 3, Resp. # 2.) From 2003 until the filing of the petition Mrs. Kight earned $100.00 weekly as a dance instructor. (Def.'s Ex. 3, Resp. # 1.) During 2007 Mrs. Kight earned $30,000.00 as a tribunal auditor for the Diocese of St. Augustine. (Id.)

On January 4, 2006 the Internal Revenue Service filed a Notice of Tax Lien in the public records of St. Johns County for Plaintiffs' unpaid 2000 federal income taxes. (Pls.' Ex. 57.) On July 17, 2007 Plaintiffs filed a Chapter 13 bankruptcy petition, which was later converted to a Chapter 7 case. (Main Case, Doc. 1.) On April 1, 2008 Plaintiffs received a discharge. (Main Case, Doc. 48.) On December 20, 2008 Mr. Kight's parents transferred the Gerona Road Property back to Plaintiffs unencumbered by a mortgage. (Def.'s Ex. 18.)

Between April 21, 2008 and July 27, 2009 the IRS sent Plaintiffs at least three letters or notices informing them that they owed taxes for 2000. (Pls.' Exs. 39, 43, 49.) Between May 19, 2008 and May 4,

---

**3.** Be that as it may, the IRS failed to prove how much equity there was in the Gerona Road Property at the time of the transfer. While it is clear that the principal amount of the mortgage at the time it was entered into was $126,000.00, the IRS failed to introduce evidence as to the amount of the payoff at the time Mr. Kight's parents satisfied the mortgage.

2009 the IRS sent Plaintiffs at least three notices informing them that it had applied an overpayment from another tax year to Plaintiffs' 2000 taxes. (Pls.' Exs. 40, 42, 45.) On July 26, 2007 and July 30, 2008 the IRS sent letters to Plaintiffs' employers directing them to require Plaintiffs to claim zero withholding allowances. (Pls.' Ex. 44.) At some point after the filing of this adversary complaint the IRS garnished Mrs. Kight's wages for the 2000 taxes. (Pls.' Ex. 46.)

On June 17, 2010 Plaintiffs filed this adversary complaint alleging that the IRS' post-discharge attempts to collect Plaintiffs' 2000 taxes are a violation of the discharge injunction. Plaintiffs seek: 1) the entry of an order directing the IRS to refund amounts which were improperly attributed to the 2000 taxes; 2) an order directing the IRS to cease collection efforts for the discharged years; and 3) costs and attorney's fees. Plaintiffs did not file an administrative claim with the IRS prior to filing this adversary proceeding.

### Conclusions of Law

The preliminary issue before the Court is whether Plaintiffs' 2000 taxes were discharged by their bankruptcy filing. If the Court finds the 2000 taxes were discharged, the Court must then determine whether Plaintiffs are entitled to damages or attorney's fees for the IRS' post-discharge attempts to collect those taxes.

■ An individual debtor who files a petition under Chapter 7 of the Bankruptcy Code is generally granted a discharge from all debts that arose before the filing of the bankruptcy petition. See 11 U.S.C. § 727(b). The benefits of protection under the bankruptcy laws are limited to the "honest but unfortunate debtor" who, de-

spite his best efforts, is unable to meet the demands of his creditors. *In re Fretz*, 244 F.3d 1323, 1326 (11th Cir.2001); *see also Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Congress has enacted a number of exceptions to the bankruptcy discharge. See 11 U.S.C. § 523. Exceptions to discharge must be strictly construed in order to give effect to the "fresh start" policy of the Bankruptcy Code. *See Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994). In order for a particular debt to be excepted from discharge, a plaintiff must prove by a preponderance of the evidence that a debtor's actions fit within the exception. *See Grogan v. Garner*, 498 U.S. at 291, 111 S.Ct. 654.

■ Section 523(a)(1)(C) renders nondischargeable any tax debt "with respect to which the debtor ... willfully attempted in any manner to evade or defeat such tax."[4] In order to establish that a debtor has willfully evaded his taxes pursuant to § 523(a)(1)(C) the government must prove by a preponderance of the evidence that the debtor engaged in (1) evasive conduct with (2) a mental state consistent with willfulness. *In re Mitchell*, 633 F.3d 1319, 1327 (11th Cir.2011).

### Conduct Requirement of § 523(a)(1)(C)

■ With regard to the conduct element, "the plain statutory language simply requires that the debtor have 'attempted in *any manner* to evade or defeat tax.'" *In re Fretz*, 244 F.3d 1323, 1329 (11th Cir.2001) (emphasis added) (internal citation omitted). "The government satisfies the conduct requirement when it proves the debtor engaged in affirmative acts to avoid payment or collection of taxes, either

---

4. Section 523(a)(1)(C) also excepts from discharge a tax for which a fraudulent return was filed. That portion of the statute is not relevant to the instant proceeding.

through commission or culpable omission." *In re Jacobs,* 490 F.3d 913, 921 (11th Cir. 2007) (citations and quotation marks omitted). The failure to file tax returns, coupled with the failure to pay taxes, has been deemed to satisfy the conduct requirement. *Fretz,* 244 F.3d at 1329 (holding that debtor who failed to file income tax returns for over ten years and failed to pay tax satisfied § 523(a)(1)(C)'s conduct requirement despite no affirmative conduct to evade taxes); *Mitchell,* 633 F.3d at 1327 (holding that debtor who filed his 1998–2002 tax returns in June 2003 and failed to pay satisfied the conduct requirement). But, a debtor's failure to pay taxes, standing alone, does not "fall within the scope of [§ ] 523(1)(C)'s exception to discharge ..." *In re Haas,* 48 F.3d 1153, 1156–1158 (11th Cir.1995) (noting that a finding that a debtor's awareness of his duty to pay his taxes and the present ability to do so constitutes willful attempt to evade or defeat the tax would "render the general rule of discharge for tax liabilities an empty letter and defeat the central purpose of the Bankruptcy Code").

### *Mental State Requirement of § 523(a)(1)(C)*

In order to satisfy the mental state requirement, the government must prove that a debtor (1) had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty. *Fretz,* 244 F.3d at 1330 (citing *In re Griffith,* 206 F.3d 1389, 1396 (11th Cir.2000)). In order to show that a debtor voluntarily and intentionally violated his duty to pay, it is not necessary to establish fraudulent intent. *Jacobs,* 490 F.3d at 924. "The third or willfulness component of the mental state requirement 'prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate.'" *Fretz,* 244 F.3d at 1330 (quoting *In re Birkenstock,* 87 F.3d 947, 952 (7th Cir.1996)).

### *Application to the Instant Case*

As the Court noted, Plaintiffs filed their 2000 tax return on November 15, 2001, a month after the October 15, 2001 due date of the return. The IRS does not appear to argue that the month late filing, coupled with Plaintiffs' failure to pay, satisfies the conduct requirement as set forth in *Fretz.* To the extent that it does make such an argument, however, the Court finds that the month late filing, coupled with the failure to pay, does not, standing alone, satisfy the conduct requirement.

The issue is whether Plaintiffs' remaining conduct amounts to more than a mere failure to pay. The Eleventh Circuit has on several occasions addressed the issue of the dischargeability of taxes owed by a debtor who timely filed his tax return(s) but failed to pay. The debtor in *Jacobs* timely filed his tax returns but 1) titled a home solely in his wife's name (but remained on the mortgage) and made all of the payments to avoid the attachment of tax liens; 2) caused his law firm to characterize his earnings as officer compensation not subject to tax withholding and then failed to pay estimated taxes on the earnings; 3) purchased numerous luxury vehicles through his law firm which he and his wife used for personal purposes; and 4) made large discretionary expenditures including $20,000.00 for plastic surgery for his wife, $1,000.00 monthly for a golf club membership and entertaining expenses, and $600.00–$700.00 monthly for a leased Mercedes Benz for his wife at the time of trial. *Jacobs,* 490 F.3d at 925–926. Rejecting the debtor's argument that his conduct was nothing more than a failure to

pay taxes, the court held that the debtor's acts satisfied § 523(a)(1)(C)'s conduct requirement. *Id.* at 925.

The debtor in *Griffith* was the long time sole owner of three corporations. *Griffith,* 206 F.3d at 1391. After an IRS audit revealed that the debtor had substantially underpaid his taxes for several years, the debtor sought reconsideration by the tax court of the amount owed. *Id.* Less than a month after the tax court found that the debtor owed a substantial amount of past due taxes, the debtor incorporated a new business, making his long time live in girlfriend the sole shareholder. *Id.* Less than a year after the tax court decision, the debtor married his girlfriend and transferred all of his stock in the three corporations to her and himself as tenants by the entirety, along with $390,000.00 in promissory notes. *Id.* The debtor also transferred assets from another corporation to the new corporation, insulating the assets from the IRS' collection attempts. *Id.* The bankruptcy court held that the tax liability was excepted from the debtor's discharge and the district court affirmed. *Id.* at 1392. Finding that the transfers of property by the debtor for little or no consideration satisfied the conduct requirement and that such conduct was willful, the Eleventh Circuit affirmed the district court's order. *Id.* at 1396.

The debtor in *Haas* timely filed his tax returns but failed to pay the tax due. *Haas,* 48 F.3d at 1155. The bankruptcy court found that the debtor used his income to pay personal and business expenses rather than pay his taxes. *Id.* The bankruptcy court found that the debtor's nonpayment was not the result of willful conduct to defeat or evade taxes but was instead the result of "mistaking the priority and importance of certain financial obligations." *Id.* The district court reversed, finding that the debtor's decision to use his

financial resources for purposes other than paying his taxes was a willful attempt to evade his taxes. *Id.* The Eleventh Circuit rejected the government's argument that a debtor's awareness of his duty to pay his taxes and the present ability to do so is a willful attempt to evade or defeat the tax and held that the taxes were dischargeable. *Id.* at 1158.

It is against the backdrop of these fact intensive determinations that the Court must determine whether Plaintiffs' conduct was a mere failure to pay or something more. The IRS argues that 1) Plaintiffs' use of the money from the contingency fee to pay creditors rather than to make estimated tax payments; 2) Plaintiffs' use of the money for living expenses including private school tuition; 3) Plaintiffs' use of the money to purchase a car and furniture; 4) Plaintiffs' investment of some of the money into mutual funds; 5) Plaintiffs' use of a portion of the money to invest in a bar; and 6) Plaintiffs' transfer of the equity in the Gerona Road Property to Mr. Kight's parents constitute affirmative acts sufficient to satisfy the conduct requirement of § 523(a)(1)(C).

Upon a thorough review of the record, the Court finds that the IRS failed to prove by a preponderance of the evidence that Plaintiffs engaged in affirmative acts sufficient to meet § 523(a)(1)(C)'s conduct requirement. Almost immediately upon receipt of the contingency fee, Plaintiffs spent over $100,000.00 catching up on past due obligations, including spending approximately $40,000.00 to pay past due federal and state income taxes and $65,000.00 to pay off two lines of credit. The Court finds that Plaintiffs' payment of such debts instead of making an estimated tax payment to the IRS was not an affirmative act by Plaintiffs to avoid the payment or collection of their 2000 taxes.

The Court finds that Plaintiffs' use of $90,000.00–$95,000.00 for living expenses over the course of the approximate one and a half year period from March of 2000 to September 2001 does not constitute an affirmative act to avoid the payment or collection of taxes. Aside from Mrs. Kight's minimal tip income from her job as a server and bartender at the Irish pub, the money was the only source of funds to pay Plaintiffs' living expenses. While Plaintiffs used a portion of the money to pay Catholic school tuition, Mrs. Kight's un-rebutted testimony was that Plaintiffs were advised by therapists, psychologists, and psychiatrists that it was necessary for their autistic son to attend private school. Additionally, Plaintiffs' purchase of furniture in the amount of $4,700.00 and a second vehicle in the amount of $5,000.00 are not luxury expenditures. Unlike the debtor in *Jacobs*, there is simply no evidence that Plaintiffs lived a luxurious lifestyle.

While it is clear that Plaintiffs' decision to invest a portion of the contingency fee in a mutual fund and their subsequent decision to take out a margin loan to fund the down payment on the purchase of an Irish pub were poor decisions, the Court finds that those acts were misguided attempts to respectively: earn enough to pay off the tax liability to the IRS and to produce income upon which to live. The Court does not find that those acts satisfy the conduct requirement set forth in § 523(a)(1).

The Court does not find that Plaintiffs' failure to pay to the IRS any portion of the money they received when they liquidated their Raymond James account in November, 2001 to be an affirmative act to avoid the payment or collection of taxes. Mr. Kight testified that they did not send any portion of the money to the IRS because "once again we were faced with we had no income, no job, no Bar license, no pub to run, nothing, and this was the only money we had … the memories we had of the way [of] life with no money were never far from mind." (Tr. at 78–79.) Mrs. Kight testified that it had become clear to Plaintiffs that if they used the proceeds from the Raymond James account to pay the IRS, they would not have enough money to maintain a home, to feed their family and to pay for their autistic son's uninsured medical expenses and necessary private school. (Tr. at 119–120.)

Finally, assuming there was equity in the Gerona Road Property at the time of its transfer, the Court does not find that Plaintiffs' transfer of the Property was an act to prevent the IRS from selling it and obtaining the equity therein. Plaintiffs were behind on their mortgage and the bank was threatening to foreclose if they did not transfer the property to Mr. Kight's parents. The Court finds that Plaintiffs transferred the Property to keep a roof over their heads. It was an act, like many others in Plaintiffs' lives, borne of desperation. Plaintiffs had also run up $40,000.00 on a line of credit. Unlike the debtor in *Griffith*, Plaintiffs' transfer of the Gerona Road Property was not a transfer of the equity therein for no consideration because Mr. Kight's parents' payoff of the line of credit was consideration for the transfer of the Property.

The Court finds that Plaintiffs' failure to pay their 2000 taxes is akin to that of the debtor in *Haas*. While Plaintiffs mistook the priority and importance of their tax liability, choosing instead to pay personal expenses, their conduct amounts to nothing more than a failure to pay and does not satisfy the conduct requirement set forth in § 523(a)(1)(C). Having found that Plaintiffs did not engage in evasive conduct as defined in § 523(a)(1)(C) with respect to the nonpayment of their 2000

taxes, the Court need not address the mental state requirement.

### Violation of the Discharge Injunction

■ Section 524 of the Bankruptcy Code operates as a post-discharge injunction against the collection of debts discharged in bankruptcy and is thus the embodiment of the Code's fresh start concept. *Hardy v. United States (In re Hardy)*, 97 F.3d 1384, 1388–1389 (11th Cir. 1996). Section 524 provides in relevant part:

> (a) A discharge in a case under this title—
>
> > (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived;

Because Plaintiffs' 2000 taxes were discharged, the IRS' post-discharge actions to collect the 2000 taxes violated the discharge injunction.

### Damages

■ While the doctrine of sovereign immunity prevents the federal government from being sued without its consent, *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941), pursuant to 11 U.S.C. § 106, sovereign immunity is abrogated as to a governmental unit with respect to, among other sections of the Bankruptcy Code, section 524. However, such immunity is abrogated only to the extent set forth in § 106. A bankruptcy court may issue an order awarding compensatory but not punitive damages against a governmental unit. 11 U.S.C. § 106(a)(3). Additionally, the enforcement of any such order "shall be consistent with appropriate non-bankruptcy law applicable to such governmental unit." 11 U.S.C. § 106(a)(4).

■ Section 7433 of the Internal Revenue Code constitutes such applicable non-bankruptcy law. Paragraph (e) of § 7433 is the only statute under which a debtor can petition a bankruptcy court to recover damages against the IRS for a willful violation of the discharge injunction. Section 7433(e)(2)(A) provides that "notwithstanding section 105 of such Title 11, such petition shall be the exclusive remedy for recovering damages resulting from such actions." While § 7433(e) is the exclusive remedy available to a debtor to redress violations of the discharge injunction by the IRS, such remedy is not available to taxpayers unless they first exhaust their administrative remedies within the IRS. 26 U.S.C. § 7433(d)(1). *In re Lowthorp*, 332 B.R. 656, 660 (Bankr. M.D.Fla.2005); *In re Graycarr, Inc.*, 330 B.R. 741, 747 (Bankr.W.D.Ark.2005); *See also Klauer v. United States*, 2007 WL 4206602 (M.D. Fla.2007 November 27, 2007) (holding that bankruptcy court lacked jurisdiction to award attorney's fees because debtor taxpayer improperly filed administrative claim and thus failed to exhaust his administrative remedies).

The Treasury Regulations go into great detail regarding the filing of an administrative claim. A taxpayer seeking actual, direct economic damages for the IRS' violation of the discharge injunction must send a claim in writing to the Chief, Local Insolvency Unit, for the judicial district in which the taxpayer filed the underlying bankruptcy case. 26 C.F.R. § 301.7433–2(e)(1). No action for damages under § 7433(e) will be maintained in bankruptcy court before the earlier of: (1) the date of the IRS decision on the administrative claim and (2) six months after the administrative claim is filed. 26 C.F.R. § 301.7433–2(d).

Attorney's fees are not recoverable under 26 U.S.C. § 7433 but may be recovera-

ble under 26 U.S.C. § 7430. Section 7430 also requires that a taxpayer exhaust all administrative remedies prior to an award of attorney's fees. 26 U.S.C. § 7430(b)(1). Specifically, a taxpayer must file an administrative claim as set forth in 26 C.F.R. § 301.7433–2(e) and described above. See 26 C.F.R. § 301.7433–2(h).

Plaintiffs did not file an administrative claim with the IRS prior to filing this adversary proceeding. Accordingly, they did not fulfill the jurisdictional prerequisites for obtaining damages under § 7433 or attorney's fees under § 7430 and are precluded from recovering damages or attorney's fees in this action.

### Conclusion

Because Plaintiffs did not attempt in any manner to evade or defeat their 2000 tax liability, it is not excepted from their discharge pursuant to 11 U.S.C. § 523(a)(1)(C). Accordingly, the IRS' post-discharge actions to collect the 2000 taxes violated the discharge injunction. Because Plaintiffs did not did not file an administrative claim with the IRS prior to filing this adversary proceeding, they are precluded from recovering damages or attorney's fees in this action. The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.